# UNITED STATES *v.* HASTING ET AL.

No. 81–1463.   Argued December 7, 1982—Decided May 23, 1983

500

BURGER, C. J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a separate statement, *post*, p. 512. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 512. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 519.

*John Fichter De Pue* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey,* and *Harriet S. Shapiro.*

*Paul Victor Esposito,* argued the cause for respondents. With him on the brief were *Robert C. Babione* and *William L. Gagen.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to review the reversal of respondents' convictions because of prosecutorial allusion to their failure to rebut the Government's evidence.

## I

On October 11, 1979, in the vicinity of East St. Louis, Ill., three young women and a man, Randy Newcomb, were riding in an automobile when a turquoise Cadillac forced them off the road. The occupants of the Cadillac, later identified as Napoleon Stewart, Gregory Williams, Gable Gibson, Kevin Anderson, and Kelvin Hasting, respondents here, forcibly removed the women from the car in which they were riding with Newcomb; in Newcomb's presence, Stewart and Gibson immediately raped one of them and forced her to perform acts of sodomy. Newcomb was left behind while the three women were then taken in the Cadillac to a vacant garage in St. Louis, Mo.; there they were raped and forced to perform deviant sexual acts. Two of the women were then taken to Stewart's home where Stewart and Williams took turns raping and sodomizing them. The third victim was taken in a separate car to another garage where the other respondents repeatedly raped her and compelled her to perform acts of sodomy.

About 6 a. m., the three women were released and they immediately contacted the St. Louis police; they furnished descriptions of the five men, the turquoise Cadillac, and the locations of the sexual attacks. From these descriptions, the police immediately identified one of the places to which the women were taken—the home of respondent Napoleon Stewart. With the consent of Stewart's mother, police entered the home, arrested Stewart, and found various items of the victims' clothing and personal effects. The turquoise Cadillac was located, seized, and found to be registered to Williams. On the basis of the information gathered, the police arrested Williams, Gibson, Anderson, and Hasting, all of whom were later identified by the victims during police lineups.

Respondents were charged with kidnaping in violation of 18 U. S. C. § 1201(a)(1), transporting a woman across state lines for immoral purposes in violation of the Mann Act, 18

U. S. C. § 2421, and conspiracy to commit the foregoing offenses in violation of 18 U. S. C. § 371.   They were tried before a jury.   The defense relied on a theory of consent and—inconsistently—on the possibility that the victims' identification of the respondents was mistaken.   None of the respondents testified.

At the close of the case, and during the summation of the prosecutor, the following interchange took place:

> "[PROSECUTOR]: . . . Let's look at the evidence the defendant[s] put on here for you so that we can put that in perspective.   I'm going to tell you what the defendant[s] did not do.   Defendants on cross-examination and—
>
> "[DEFENSE COUNSEL]: I'll object to that, Your Honor.   You're going to instruct to the contrary on that and the defendants don't have to put on any evidence.
>
> "[PROSECUTOR]: That's correct, Your Honor.
>
> "THE COURT: That's right, they don't.   They don't have to.
>
> "[PROSECUTOR]: But if they do put on a case, the Government can comment on it.   The defendants at no time ever challenged any of the rapes, whether or not that occurred, any of the sodomies.   They didn't challenge the kidnapping, the fact that the girls were in East St. Louis and they were taken across to St. Louis.   They never challenged the transportation of the victims from East St. Louis, Illinois to St. Louis, Missouri, and they never challenged the location or whereabouts of the defendants at all the relevant times.   They want you to focus your attention on all of the events that were before all of the crucial events of that evening.   They want to pull your focus away from the beginning of the incident in East St. Louis after they were bumped, and then the proceeding events.   They want you to focus to the events prior to that.   And you can use your common sense and still see what that tells you. . . ."   Tr. 873–874.

A motion for a mistrial was denied. The jury returned a verdict of guilty as to each respondent on all counts.

On appeal, various errors were alleged, including a claim that the prosecutor violated respondents' Fifth Amendment rights under *Griffin* v. *California*, 380 U. S. 609 (1965).[1] In a terse opinion, the Court of Appeals reversed the convictions and remanded for retrial, 660 F. 2d 301 (CA7 1980), citing its decision in *United States* v. *Buege*, 578 F. 2d 187, 188, cert. denied, 439 U. S. 871 (1978), for the proposition that *Griffin* error occurs even without a direct statement on the failure of a defendant to take the stand when the "prosecutor refers to testimony as uncontradicted where the defendant has elected not to testify and when he is the only person able to dispute the testimony." The Court of Appeals declined to rely on the harmless-error doctrine, however, stating that application of that doctrine "would impermissibly compromise the clear constitutional violation of the defendants' Fifth Amendment rights." 660 F. 2d, at 303. Respondents' remaining claims were disposed of in an unpublished order that simply stated that the judgment of the District Court was reversed and the case remanded for a new trial.[2]

---

[1] Respondents also argued that the prosecution's comments violate 18 U. S. C. § 3481, which is discussed in *Griffin* v. *California*, 380 U. S., at 612. Section 3481 provides:

"In trial of all persons charged with the commission of offenses against the United States . . . the person charged shall, at his own request, be a competent witness. His failure to make such request shall not create any presumption against him."

This statute is the current codification of the Act of March 16, 1878, 20 Stat. 30, ch. 37, which was construed in *Wilson* v. *United States*, 149 U. S. 60 (1893). There the Court held that a new trial must be granted when the jury hears "comment, especially hostile comment, upon [the] failure [to testify]," *id.*, at 65, in order to effectuate the congressional policy underlying the statute. See also *Bruno* v. *United States*, 308 U. S. 287 (1939).

[2] The court's opinion and order failed to describe or decide respondents' remaining contentions. Nor were these claims presented in the parties' briefs to this Court.

The Government petitioned for rehearing, claiming that the prosecutor's remark was equivocal, nonprejudicial, and that the court failed to apply *Chapman* v. *California*, 386 U. S. 18 (1967), a case that the Court of Appeals had, in fact, failed to cite.[3] The petition for rehearing was denied. We granted certiorari, 456 U. S. 971 (1982). We reverse.

## II

The opinion of the Court of Appeals does not make entirely clear its basis for reversing the convictions in this gruesome case. Its cursory treatment of the harmless-error question and its focus on the failure generally of prosecutors within its jurisdiction to heed the court's prior admonitions about commenting on a defendant's failure to rebut the prosecution's case suggest that, notwithstanding the harmless nature of the error, the court acted in this case to discipline the prosecutor—and warn other prosecutors—for what it perceived to be continuing violations of *Griffin* and § 3481. The court pointedly emphasized its own decision in *United States* v. *Rodriguez*, 627 F. 2d 110 (1980), where it characterized the problem of prosecutorial comments on a defendant's silence as one which "continues to arise with disturbing frequency throughout this circuit despite the admonition of trial judges and this court," *id.*, at 112.

In *Rodriguez*, the court described its efforts to cure the problem by ordering circulation to all United States Attorneys of an unpublished order calling attention to the subject. In addition, the *Rodriguez* court discussed, without explicitly adopting, the rule announced by the First Circuit in *United States* v. *Flannery*, 451 F. 2d 880, 882 (1971), that any prosecutorial reference to a defendant's failure to testify is *per se*

---

[3] Arguably, the Court of Appeals also ignored 28 U. S. C. § 2111, which provides that "[o]n the hearing of any appeal . . . , the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."

grounds for reversal unless the judge immediately instructs the jury that the defendant had a constitutional right not to testify and advises the jury that the prosecutor's conduct was improper. Obviously the Court of Appeals is more familiar than we are with what appellate records show concerning prosecutorial indifference to the court's admonitions; the question we address is whether reversal of these convictions was an appropriate response. In view of this history of tension between what the Court of Appeals perceives as the requirements of *Griffin* and § 3481 and that court's view of the prosecutors' conduct, we proceed on the assumption that, without so stating, the court was exercising its supervisory powers to discipline the prosecutors of its jurisdiction. The question presented is whether, on this record, in a purported exercise of supervisory powers, a reviewing court may ignore the harmless-error analysis of *Chapman.* We hold that the harmless-error rule of *Chapman,* which we discuss in Part II–B, *infra,* may not be avoided by an assertion of supervisory power, simply to justify a reversal of these criminal convictions.

## A

### Supervisory Power

"[G]uided by considerations of justice," *McNabb* v. *United States,* 318 U. S. 332, 341 (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights, *McNabb, supra,* at 340; *Rea* v. *United States,* 350 U. S. 214, 217 (1956); to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, *McNabb, supra,* at 345; *Elkins* v. *United States,* 364 U. S. 206, 222 (1960); and finally, as a remedy designed to deter illegal conduct, *United States* v. *Payner,* 447 U. S. 727, 735–736, n. 8 (1980).

The goals that are implicated by supervisory powers are not, however, significant in the context of this case if, as the Court of Appeals plainly implied, the errors alleged are harmless. Supervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error. Further, in this context, the integrity of the process carries less weight, for it is the essence of the harmless-error doctrine that a judgment may stand only when there is no "reasonable possibility that the [practice] complained of might have contributed to the conviction." *Fahy* v. *Connecticut*, 375 U. S. 85, 86–87 (1963). Finally, deterrence is an inappropriate basis for reversal where, as here, the prosecutor's remark is at most an attenuated violation of *Griffin*[4] and where means more narrowly tailored to deter objectionable prosecutorial conduct are available.[5]

To the extent that the values protected by supervisory authority are at issue here, these powers may not be exercised in a vacuum. Rather, reversals of convictions under the court's supervisory power must be approached "with some

---

[4] JUSTICE STEVENS may well be correct that the prosecutor's argument was permissible comment. The question on which review was granted assumed that there was error and the question to be resolved was whether harmless-error analysis should have applied. Pet. for Cert. (I).

[5] Here, for example, the court could have dealt with the offending argument by directing the District Court to order the prosecutor to show cause why he should not be disciplined, see, *e. g.,* Southern District of Illinois Rule 33, or by asking the Department of Justice to initiate a disciplinary proceeding against him, see, *e. g.,* 28 CFR § 0.39 *et seq.* (1982). The Government informs us that during the year 1980, the Department of Justice's Office of Professional Responsibility investigated 28 complaints of unethical conduct and that one Assistant United States Attorney resigned in the face of an investigation that he made improper arguments to a grand jury. Brief for United States 21, n. 16. The Court also could have publicly chastised the prosecutor by identifying him in its opinion. See also *United States* v. *Modica*, 663 F. 2d 1173, 1183–1186 (CA2 1981).

caution," *Payner*, 447 U. S., at 734, and with a view toward balancing the interests involved, *id.*, at 735–736, and n. 8; *Elkins, supra*, at 216; *United States* v. *Caceres*, 440 U. S. 741, 755 (1979); cf. *Nardone* v. *United States*, 308 U. S. 338, 340 (1939). As we shall see below, the Court of Appeals failed in this case to give appropriate—if, indeed, any— weight to these relevant interests. It did not consider the trauma the victims of these particularly heinous crimes would experience in a new trial, forcing them to relive harrowing experiences now long past, or the practical problems of retry- ing these sensitive issues more than four years after the events. See *Morris* v. *Slappy, ante*, at 14–15. The conclu- sion is inescapable that the Court of Appeals focused exclu- sively on its concern that the prosecutors within its jurisdic- tion were indifferent to the frequent admonitions of the court. The court appears to have decided to deter future similar comments by the drastic step of reversal of these con- victions. But the interests preserved by the doctrine of harmless error cannot be so lightly and casually ignored in order to chastise what the court viewed as prosecutorial overreaching.

## B

### Harmless Error

Since the Court of Appeals focused its attention on *Griffin* rather than *Chapman*, an appropriate starting point is to re- call the sequence of these two cases. *Griffin* was decided first. In that case, a California prosecutor, in accordance with a provision of the California Constitution, commented to the jury on a defendant's failure to provide evidence on mat- ters that only he could have been expected to deny or ex- plain. In reliance on *Wilson* v. *United States*, 149 U. S. 60 (1893), the *Griffin* Court interpreted the Fifth Amendment guarantee against self-incrimination to mean that comment on the failure to testify was an unconstitutional burden on the basic right. Accordingly, the Court held that the constitu-

tional provision permitting prosecutorial comment on the failure of the accused to testify violated the Fifth Amendment.

Soon after *Griffin*, however, this Court decided *Chapman* v. *California*, which involved prosecutorial comment on the defendant's failure to testify in a trial that had been conducted in California before *Griffin* was decided. The question was whether a *Griffin* error was *per se* error requiring automatic reversal or whether the conviction could be affirmed if the reviewing court concluded that, on the whole record, the error was harmless beyond a reasonable doubt. In *Chapman* this Court affirmatively rejected a *per se* rule.

After examining the harmless-error rules of the 50 States along with the federal analog, 28 U. S. C. § 2111, the *Chapman* Court stated:

> "All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. *We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless*, not requiring the automatic reversal of the conviction." 386 U. S., at 22 (emphasis added).

In holding that the harmless-error rule governs even constitutional violations under some circumstances,[6] the Court recognized that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution

---

[6]The Court acknowledged that certain errors may involve "rights so basic to a fair trial that their infraction can never be treated as harmless error." 386 U. S., at 23, citing *Payne* v. *Arkansas*, 356 U. S. 560 (1958) (coerced confession); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) (right to counsel); *Tumey* v. *Ohio*, 273 U. S. 510 (1927) (impartial judge).

does not guarantee such a trial. *Brown* v. *United States*, 411 U. S. 223, 231–232 (1973), citing *Bruton* v. *United States*, 391 U. S. 123, 135 (1968); cf. *Engle* v. *Isaac*, 456 U. S. 107, 133–134 (1982). *Chapman* reflected the concern, later noted by Chief Justice Roger Traynor of the Supreme Court of California, that when courts fashion rules whose violations mandate automatic reversals, they "retrea[t] from their responsibility, becoming instead 'impregnable citadels of technicality.'" R. Traynor, The Riddle of Harmless Error 14 (1970) (quoting Kavanagh, Improvement of Administration of Criminal Justice by Exercise of Judicial Power, 11 A. B. A. J. 217, 222 (1925)).

Since *Chapman*, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations, see, *e. g.*, *Brown*, *supra*, at 230–232; *Harrington* v. *California*, 395 U. S. 250 (1969); *Milton* v. *Wainwright*, 407 U. S. 371 (1972). The goal, as Chief Justice Traynor has noted, is "to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error." Traynor, *supra*, at 81.

Here, the Court of Appeals, while making passing reference to the harmless-error doctrine, did not apply it. Its analysis failed to strike the balance between disciplining the prosecutor on the one hand, and the interest in the prompt administration of justice and the interests of the victims on the other.[7]

---

[7] Since we hold that *Chapman* mandates consideration of the entire record prior to reversing a conviction for constitutional errors that may be harmless, we do not reach the question whether 28 U. S. C. § 2111, see n. 3, *supra*, requires the same result. Its predecessor, 28 U. S. C. § 391 (1946 ed.), enacted in 1919, 40 Stat. 1181, provided that judgment was to be affirmed "without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." Under its plain meaning, this statute would not have reached a constitutional violation, see

## III

We turn, then, to the question whether, on the whole record before us, the error identified by the Court of Appeals was harmless beyond a reasonable doubt. Although we are not required to review records to evaluate a harmless-error claim, and do so sparingly, we plainly have the authority to do so.[8] See *Harrington, supra,* where the Court granted certiorari to consider the issue whether a *Bruton* error was harmless and to that end undertook its "own reading of the record," 395 U. S., at 254. See also *Chapman,* 386 U. S., at 24–26; *Milton* v. *Wainwright, supra,* at 377; *Parker* v. *Randolph,* 442 U. S. 62, 80–81 (1979) (opinion of BLACKMUN, J.). Cf. *Brown, supra,* at 231. In making this assessment, we are aided by the Court of Appeals' own explicit statement that

> "[d]espite the magnitude of *the crimes committed* and *the clear evidence of guilt,* an application of the doctrine of harmless error would impermissibly compromise the clear constitutional violation of the defendants' Fifth Amendment rights." 660 F. 2d, at 303. (Emphasis added.)

The question a reviewing court must ask is this: absent the prosecutor's allusion to the failure of the defense to proffer

*Bruno* v. *United States,* 308 U. S., at 294; *Kotteakos* v. *United States,* 328 U. S. 750, 764–765 (1946).

The original statute was, however, repealed in 1948 and replaced a year later by a version in which the term "technical" was deleted, 63 Stat. 105. Although it appears that repeal and reenactment resulted from confusion over whether Federal Rule of Criminal Procedure 52(a) and Federal Rule of Civil Procedure 61 made § 391 redundant, 11 C. Wright & A. Miller, Federal Practice and Procedure § 2881 (1973), the result is that § 2111 by its terms may be coextensive with *Chapman,* see R. Traynor, The Riddle of Harmless Error 41–43 (1970).

We need not reach this issue, or the further question whether there is a conflict between § 3481, see n. 1, *supra,* and § 2111, which appears to require affirmance of a conviction if the error is harmless.

[8] Since this Court has before it the same record the Court of Appeals reviewed, we are in precisely the position of that court in addressing the issue of harmless error.

evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty? *Harrington, supra,* at 254. A reviewing court must begin with the reality that the jurors sat in the same room day after day with the defendants and their lawyers; much testimony had been heard from the three women who described in detail the repeated wanton acts of the defendants during three hours in two States, thus negating any doubt as to identification. Immediately on their release the victims described the defendants to the police and promptly identified them in lineups. Neutral witnesses corroborated critical aspects of the victims' testimony. Randy Newcomb, a prosecution witness, testified that he witnessed the rape of one of the women shortly after the car in which he was riding was stopped; the garage owner where the second episode occurred observed two women with four men, one of whom answered to respondent Anderson's description. The automobile, which was central to the case, was a singular color and was registered to respondent Williams. Property of two of the victims was found in respondent Stewart's possession hours after the crimes; Williams' fingerprints were found on the car in which the victims had been riding. In short, a more compelling case of guilt is difficult to imagine.

Paradoxically, respondents relied for their defense on a claim of mistaken identity, yet they tendered no evidence placing any of them at other places at the relevant times. The evidence presented by them was testimony showing (a) that some of respondents' hairstyles immediately before and after the incident differed from the victims' descriptions of their assailants' appearances, (b) that *two* of the victims had been unable to pick *one* of the respondents, Anderson, out of a lineup, (c) that it was so dark at the time of the attacks and during the car trips, that Newcomb did not have an unobstructed view of the rape he described, and (d) that Stewart's mother testified that the girls she saw with her son did not look "scared." Finally, the defense intimated that the victims crossed state lines voluntarily by raising the possibility

that the women entered respondents' car willingly—a point hardly consistent with the idea that the respondents did not commit the crimes charged. That these defense efforts presented patently and totally inconsistent theories could hardly have escaped the attention of the jurors.

In the face of this overwhelming evidence of guilt and the inconsistency of the scanty evidence tendered by the defendants, it is little wonder that the Court of Appeals referred to "the crimes committed" and acknowledged the "clear evidence of guilt." Of course, none of these hard realities would ever constitute justification for prosecutorial misconduct, but here, accepting the utterance of the prosecutor as improper, criticism of him could well be directed more accurately at his competence and judgment in jeopardizing an unanswered—and unanswerable—case. On the whole record, we are satisfied beyond a reasonable doubt that the error relied upon was harmless.

The judgment of the Court of Appeals, ordering a new trial based on the prosecutor's argument, is reversed. Because other contentions were advanced by respondents that were not treated in the court's opinion, we remand to allow the Court of Appeals to consider such other claims if respondents elect to press them.

*Reversed and remanded.*

JUSTICE BLACKMUN would vacate the judgment of the Court of Appeals and remand the case for consideration by that court of the issue whether the Fifth Amendment violation it perceived to exist was harmless error within the measure of *Chapman* v. *California*, 386 U. S. 18 (1967).

JUSTICE STEVENS, concurring in the judgment.

In my opinion the prosecutor's closing argument was free of constitutional error. It is therefore unnecessary for this Court to consider the scope of the supervisory power of the

federal appellate courts,[1] and it is unjustifiable for the Court to decree that, upon examination of the record in this case, the error was harmless beyond a reasonable doubt.

Although the Government does not expressly challenge the Court of Appeals' conclusion that the prosecutor's comments were unconstitutional, both its petition and its brief on the merits question the correctness of that conclusion.[2] Without conceding that the issue is properly before this Court, respondents devote several pages of their brief to the Fifth Amendment issue.[3] That issue was raised and decided below and is clearly presented in the record. Further, both parties agree that, in determining whether the error was harmless, it is necessary to consider the content of the prosecutor's alleged comment on the defendants' silence and the likelihood that it affected the deliberations of the jury. Under these circumstances, whether or not the constitutionality of the prosecutor's remarks is "fairly subsumed" in the question presented in the petition, I believe it proper for this Court to recognize that the Court of Appeals decided this question erroneously, and to reverse the judgment on that ground without considering the supervisory power or the harmless-error doctrine.[4]

---

[1] The Court of Appeals' opinion, as JUSTICE BRENNAN's partial concurrence observes, does not expressly refer to the supervisory power, nor does it explain any of the factors that might have justified its exercise of that power. Under these circumstances, I agree with JUSTICE BRENNAN that it is improper for this Court to reach out to enunciate general principles about the limits on the supervisory power of the federal courts.

[2] See Pet. for Cert. 12, n. 10; Brief for United States 22–24, and n. 19.

[3] Brief for Respondents 37–40.

[4] See this Court's Rule 21.1(a) ("Only the questions set forth in the petition or fairly included therein will be considered by the Court"); Rule 34.1(a) ("At its option, however, the Court may consider a plain error not among the questions presented but evident from the record and otherwise within its jurisdiction to decide"). When this Court reviews a decision by a lower federal court, the scope of the questions presented does not create any jurisdictional limitation on our consideration of the case. R. Robert-

In this case the five defendants presented 16 witnesses, who raised questions about some portions of the Government's case but failed to deny or to contradict other portions. In reviewing the evidence adduced at the 5-day trial, the prosecutor identified the weaknesses in the defendants' presentations and invited inferences from the main focus of the evidence presented by the five defendants. I believe that the prosecutor's closing argument did not constitute improper comment on the defendants' failure to testify.

The four young people involved in this case arrived at Millas' Steak House at about midnight on October 11, 1979, in a car driven by one of the young women, who had apparently borrowed the car from her boyfriend. The driver and another of the young women went into the bar-restaurant and stayed two or three hours, drinking Pina Coladas and dancing, while the third young woman sat in the back seat of the car drinking beer with the young man. When they left Millas' at approximately 3 a. m., the other young woman decided to drive. The car needed oil. Instead of turning right in the direction of their homes, along a highway that would bring them to at least one all-night gas station, they turned left. This route led them to a Clark station and then to the spot where they were forced off the road. Defense counsel emphasized these facts in an attempt to cast doubts on the victims' ability to identify all of the defendants accurately, and to suggest the implausibility of their accounts.[5] The

son & F. Kirkham, Jurisdiction of the Supreme Court of the United States § 418 (R. Wolfson & P. Kurland ed. 1951). Although we usually decline to address issues not expressly presented by the petition, we occasionally depart from this rule of practice. See, e. g., *Procunier* v. *Navarette*, 434 U. S. 555, 559–560, n. 6 (1978); *Washington* v. *Davis*, 426 U. S. 229, 238, and nn. 8, 9 (1976); *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation*, 402 U. S. 313, 320–321, n. 6 (1971).

[5] See, e. g., Tr. 169–174, 192–193, 204–213, 249–257 (cross-examination of first young woman); 335–338, 342–344, 351–363, 369–374 (cross-examination of second young woman); 431–441, 448, 454, 462–465, 468–472, 497–502 (cross-examination of third young woman); 528–531, 536–540, 553–556, 562–564 (cross-examination of the young man); 884–885, 891–892, 902,

prosecutor argued, quite properly in my opinion, that the defense had tried to divert the jury's attention from the central question in the case—what happened after the car was forced off the road by defendants' Cadillac. That central question could have been addressed by defense witnesses and defense counsel even without testimony by the defendants themselves.[6]

As I have written before, a defendant's election not to testify "is almost certain to prejudice the defense no matter what else happens in the courtroom." *United States* v. *Davis*, 437 F. 2d 928, 933 (CA7 1971). Under *Griffin* v. *California*, 380 U. S. 609 (1965), it is improper for either the court or the prosecutor to ask the jury to draw an adverse inference from a defendant's silence. But I do not believe the protective shield of the Fifth Amendment should be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense case. The comment in this record, *ante*, at 502, is not remotely comparable to the error in either *Griffin*[7] or *Wilson* v.

---

933–935 (closing arguments). The defense counsel also attempted to undermine the Government's case by pointing to vagueness and inconsistency in the witnesses' accounts of the episode and their descriptions of the suspects.

[6] Reference to uncontradicted portions of the Government's evidence is improper only when the statement will naturally and necessarily be construed by the jury to be an allusion to the defendant's failure to testify.

[7] " 'He would know that. He would know how she got down the alley. He would know how the blood got on the bottom of the concrete steps. He would know how long he was with her in that box. He would know how her wig got off. He would know whether he beat her or mistreated her. He would know whether he walked away from that place cool as a cucumber when he saw Mr. Villasenor because he was conscious of his own guilt and wanted to get away from that damaged or injured woman.

" 'These things he has not seen fit to take the stand and deny or explain.

" 'And in the whole world, if anybody would know, this defendant would know.

" 'Essie Mae is dead, she can't tell you her side of the story. The defendant won't.' " 380 U. S., at 611.

*United States*, 149 U. S. 60 (1893).[8]   In my opinion it did not violate either the Fifth Amendment or 18 U. S. C. § 3481 as construed in *Wilson*.

If I were persuaded that the prosecutor's comment was improper, I could not possibly join the Court's *sua sponte* harmless-error determination.   In reviewing a federal criminal conviction, a federal appellate court should apply a stringent harmless-error test—more stringent than the test that is constitutionally permissible in state-court proceedings under *Chapman* v. *California*, 386 U. S. 18 (1967).   A federal appellate court should not find harmless error merely because it believes that the other evidence is "overwhelming." As we wrote in *Kotteakos* v. *United States*, 328 U. S. 750, 763–764 (1946):

> "[I]t is not the appellate court's function to determine guilt or innocence. . . . Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. . . . [T]he question is, not were [the jury] right in their judgment, regardless of the error or its effect upon the verdict.   It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision.   The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting."

This Court is far too busy to be spending countless hours reviewing trial transcripts in an effort to determine the likeli-

---

[8] "When the District Attorney, referring to the fact that the defendant did not ask to be a witness, said to the jury, 'I want to say to you, that if I am ever charged with crime, I will not stop by putting witnesses on the stand to testify to my good character, but I will go upon the stand and hold up my hand before high Heaven and testify to my innocence of the crime,' he intimated to them as plainly as if he had said in so many words that it was a circumstance against the innocence of the defendant that he did not go on the stand and testify.   Nothing could have been more effective with the jury to induce them to disregard entirely the presumption of innocence to which by the law he was entitled . . . ."   149 U. S., at 66.

hood that an error may have affected a jury's deliberations. In this case the parties did not provide us with a printed appendix containing any portion of the trial testimony or with any of the trial exhibits that are discussed at some length in the transcript. I have spent several hours reviewing the one copy of the trial transcript that has been filed with the Court. But I have not read all of its 1,013 pages, and I have read only a few of the 450 pages of the transcript of the suppression hearing. The task of organizing and digesting the testimony is a formidable one. The victims' testimony refers to the perpetrators by various descriptions—"the one with the goatee," "the tall one," "the skinnier one," "the heavier set one," "the bigger one," "a stocky, heavy set guy," "the fat one," "the short, thinner one," "the one in the big hat," "the guy with the hair out," "the guy with the fro," the "shorter one with short hair," the "skinnier one with the shorter hair," "a younger guy," "the guy with the smudged up nose," "the smashed nose," and "the ones that was in the back"—rather than by name. As a practical matter, it is impossible for any Member of this Court to make the kind of conscientious and detailed examination of the record that should precede a determination that there can be no reasonable doubt that the jury's deliberations as to each defendant were not affected by the alleged error. And it is an insult to the Court of Appeals to imply, as the Court does today, that it cannot be trusted with a task that would normally be conducted on remand. *Ante*, at 510.

I have read enough to persuade me that there is a high probability that each of the defendants was correctly identified as a participant in the events of October 11, 1979. But I could not possibly state with anything approaching certainty that the 12 jurors who spent three hours deliberating the fate of these five defendants would not have entertained a reasonable doubt concerning at least one of the guilty verdicts if the error in question were purged from the record.

The Court states that there can be no question about the defendants' guilt because the women "described in detail the

repeated wanton acts of the defendants during three hours in two States, thus negating any doubt as to identification." *Ante*, at 511. I would not characterize their testimony—particularly that relating to identification—as "detailed."[9] It is, of course, true that the witnesses had ample opportunity to observe their assailants, and that there is no reason to question their sincerity. But each of the witnesses had different opportunities to view and identify the various defendants. Two of them could not identify one of the defendants in a lineup only a short time after the events took place.[10] Indeed, although the witnesses testified at trial that there were five men in the car that forced them off the road, in a prior statement one or more of them had said that there were four.[11] Hence the testimony at least leaves open the possibility of some confusion and some mistaken identification within the group.

I share the Court's reaction to the offensive character of the misconduct involved in this case. I believe, however, that this factor enhances the importance of making sure that procedural safeguards are followed and that there is no reasonable doubt concerning the guilt of each one of the five accused individuals. I do not believe the prosecutor committed procedural error in this case; if he did, however, I feel strongly that this Court should not make a clumsy effort to avoid another trial by undertaking a function that can better be performed by other judges. We, of course, would not

---

[9] For testimony regarding the descriptions of the suspects that the victims gave to the police, see Tr. of Suppression Hearing ("Plaintiff's Witnesses") 37, 119–120, 318–319; Tr. of Suppression Hearing ("Government Witness") 6, 45–47, 55–56; Tr. 648. See generally *id.*, at 114–129, 295–310, 407–423.

[10] Tr. of Suppression Hearing ("Plaintiff's Witnesses") 105–107; Tr. 235.

[11] *Id.*, at 193, 215–216, 222–223, 485–486, 885, 903–904, 906. Asked on cross-examination about this discrepancy, the witness explained: "[M]y mind has really been confused and I have to really sit and look back on things because I have been trying to forget everything." *Id.*, at 193. The Clark station attendant testified that there were four black men in the Cadillac. *Id.*, at 753.

want any of the victims to go through the ordeal of testifying again unless reversible error has been committed. On the other hand, we surely would not want one of the defendants to spend 40 years in jail just because the evidence against the other four is overwhelming.

Because I believe that there was no constitutional error in the prosecutor's remarks, I agree with the Court that the Fifth Amendment does not serve as a basis for reversal of these convictions. I concur in the Court's judgment but not in its opinion.[12]

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

In this case the Court of Appeals issued an opinion reversing the convictions of the respondents. 660 F. 2d 301 (CA7 1981). Most of the opinion consists of a discussion of the facts. *Id.*, at 301–303. In its brief legal analysis, the court relied on its decision in *United States* v. *Buege*, 578 F. 2d 187 (1978), to find that the prosecutor had violated the respondents' Fifth Amendment rights by commenting on their failure to testify. 660 F. 2d., at 303. The court declined to apply the harmless-error doctrine to this violation. The court stated that an application of the doctrine "would impermissibly compromise the clear constitutional violation of [respondents'] Fifth Amendment rights." *Ibid.*

On its face, the Court of Appeals' opinion adopts a rule of automatic reversal for improper prosecutorial comment on a defendant's failure to testify. Such a rule was rejected by this Court in *Chapman* v. *California*, 386 U. S. 18, 22 (1967). The respondents argue that the Court of Appeals' decision to disregard *Chapman* was justified as an exercise of the court's supervisory powers. Brief for Respondents 15–36. I would

---

[12] The Court reverses and remands to permit consideration of any remaining contentions by respondents that were not treated in the Court of Appeals' opinion, a disposition acknowledged by the Government to be appropriate. See Brief for United States 22, n. 18.

reject this argument on the ground that the Court of Appeals did not invoke its supervisory powers or provide any explanation of why this might be an appropriate case for the exercise of such powers.  In order to rely on its supervisory powers to reverse a conviction a court of appeals should be required, at the least, to invoke them expressly.[1]  In view of the Court of Appeals' refusal to apply the harmless-error doctrine announced in *Chapman* and its failure to offer any reasons to justify its refusal, I would vacate the court's decision and remand the case for application of the harmless-error test announced by *Chapman* and a determination of whether the error in this case was harmless beyond a reasonable doubt.[2]

---

[1] It is possible that a court of appeals might not always have to provide a detailed explanation of a decision to invoke its supervisory powers.  If, for example, the court in a prior case had announced a new rule adopted pursuant to its supervisory powers it may not have to explain again in a subsequent case the considerations that supported adoption of the rule.  At the least, however, the court should invoke expressly the previously announced rule in order to make clear the basis for its decision.

As the Court points out, *ante*, at 504–505, the Court of Appeals discussed the continuing problem of improper prosecutorial comment in *United States* v. *Rodriguez*, 627 F. 2d 110 (CA7 1980), which is cited in the court's opinion in this case.  See 660 F. 2d, at 303.  The Court states that the *"Rodriguez* court discussed, without explicitly adopting, the rule announced by the First Circuit in *United States* v. *Flannery*, 451 F. 2d 880, 882 (1971), that any prosecutorial reference to a defendant's failure to testify is *per se* grounds for reversal unless the judge immediately instructs the jury that the defendant had a constitutional right not to testify and advises the jury that the prosecutor's conduct was improper." *Ante*, at 504–505.  In fact, the Court of Appeals *expressly declined* "to adopt so strict a rule." 627 F. 2d, at 113.

[2] As JUSTICE POWELL noted in *Connecticut* v. *Johnson*, 460 U. S. 73 (1983), the question of whether an error is harmless is "[n]ormally . . . a question more appropriately left to the courts below." *Id.*, at 102 (dissenting opinion). Accord, *Moore* v. *Illinois*, 434 U. S. 220, 232 (1977); *Coleman* v. *Alabama*, 399 U. S. 1, 11 (1970); *Foster* v. *California*, 394 U. S. 440, 444 (1969); *United States* v. *Wade*, 388 U. S. 218, 242 (1967).  For reasons that are not clear, the Court declines to follow this practice in this case.  See *ante*, at 510.

Instead of deciding the case on the grounds described above, the Court relies on prior decisions by the Court of Appeals to support an assumption that "without so stating, the court was exercising its supervisory powers to discipline the prosecutors of its jurisdiction." *Ante*, at 505. Based on this assumption, the Court poses its own question for review: "whether, on this record, in a purported exercise of supervisory powers, a reviewing court may ignore the harmless-error analysis of *Chapman*." *Ibid.* This question is not presented by the case. As noted, the Court of Appeals did not state that it was relying on its supervisory powers to reverse the convictions. It is sheer speculation for the Court to suggest that it was. Moreover, it is wholly inappropriate to address an important question concerning the scope of a federal appellate court's supervisory powers based on the Court of Appeals' decision in this case. Given the fact that the Court of Appeals did not expressly invoke its supervisory powers, it obviously also failed to detail the considerations that supported the exercise of such powers. The Court, therefore, has no explanation on which to base an analysis of the propriety of the Court of Appeals' assumed exercise of its supervisory powers. The respondents' effort to justify the Court of Appeals' disposition of this case based on an exercise of the court's supervisory powers provides no commission to this Court to decide important questions that are unnecessary to a decision in the case, are not presented by it, and cannot be analyzed carefully, if at all, based on the decision involved.

The problems posed by the Court of Appeals' failure to explain its decision are evident in the Court's discussion of supervisory powers. The Court suggests, for example, that "in this context, the integrity of the process carries less weight, for it is the essence of the harmless-error doctrine that a judgment may stand only when there is no 'reasonable possibility that the [practice] complained of might have contributed to the conviction.'" *Ante*, at 506 (citation omitted).

Unfortunately, we cannot be sure of the precise "context" in which this case arose. If, for example, the violation in this case was another in a long line of intentional violations of defendants' rights by Government prosecutors, the "context" might be considerably different. An assessment of the weight carried by the "integrity of the process" also might be affected substantially by evidence of this sort. It is difficult to imagine that a series of intentional violations of defendants' constitutional rights by Government prosecutors who are officers of the court charged with upholding the law would not have a considerable detrimental effect on the integrity of the process and call for judicial action designed to restore order and integrity to the process.

The Court also states that "deterrence is an inappropriate basis for reversal where, as here, the prosecutor's remark is at most an attenuated violation of *Griffin* and where means more narrowly tailored to deter objectionable prosecutorial conduct are available." *Ibid.* (footnotes omitted). Without disputing that a court of appeals generally should use means more narrowly tailored than reversal to deter improper prosecutorial conduct, there may be reasons why a court of appeals would reject the use of such means. Prior experience, for example, might have demonstrated the futility of relying on Department of Justice disciplinary proceedings.

The Court also states that "reversals of convictions under the court's supervisory power must be approached 'with some caution' . . . and with a view toward balancing the interests involved . . . ." *Ante,* at 506–507. The Court goes on to state that the "Court of Appeals failed in this case to give appropriate—if, indeed, any—weight to these relevant interests." *Ante,* at 507. According to the Court, the Court of Appeals "did not consider the trauma the victims of these particularly heinous crimes would experience in a new trial, forcing them to relive harrowing experiences now long past, or the practical problems of retrying these sensitive issues

more than four years after the events." *Ibid.* In the Court's view, "[t]he conclusion is inescapable that the Court of Appeals focused exclusively on its concern that the prosecutors within its jurisdiction were indifferent to the frequent admonitions of the court." *Ibid.* In my view, what the Court of Appeals did or did not do is a matter of sheer speculation. In the absence of an explanation, the Court has no way of knowing what considerations motivated the Court of Appeals. The speculative and unwarranted nature of the Court's analysis is exacerbated by the fact that the Court must *assume* at the outset that the Court of Appeals in fact was relying on its supervisory powers.

The only thing of which we can be sure is that the Court of Appeals refused, without an adequate explanation, to apply the harmless-error doctrine. This error calls for vacating the judgment and remanding the case. See *supra,* at 520, and n. 2. It does not call for an extended discussion of the scope of an appellate court's supervisory powers, an examination of the relationship between those powers and the harmless-error rule, a rejection of the exercise of those powers in the absence of an explanation to inform the analysis, or an application of the harmless-error rule by this Court in the first instance.

Although the Court's opinion is not clear, it is possible that it could be read to establish a *per se* rule against use of the supervisory powers to reverse a conviction based on a harmless error. Compare *ante,* at 506, 509–510, n. 7, with *ante,* at 506–507, 509. See also *ante,* at 505 ("We hold that the harmless-error rule of *Chapman* . . . may not be avoided by an assertion of supervisory power, *simply* to justify a reversal of *these* criminal convictions" (emphasis supplied)). If the Court is attempting to establish a *per se* rule against using supervisory powers to reverse a conviction based on harmless error, the absence of an explanation by the Court of Appeals is not as great an impediment to its decision. The fact remains, however, that the question the Court chooses

to resolve is not presented by the case and should not be reached. Although I would not reach the question, I do not believe that *Chapman*, or the fact that an error is harmless, necessarily precludes a court of appeals from exercising its supervisory powers to reverse a conviction.

In *Chapman* the Court addressed the question of whether a violation of the rule of *Griffin* v. *California*, 380 U. S. 609 (1965), can be held to be harmless. 386 U. S., at 20. In considering this question, the Court rejected a rule of automatic reversal. *Id.*, at 22. We noted the prevalence of harmless-error statutes or rules and stated that these rules "serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Ibid.* In this light, we concluded that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Ibid.*[3]

In *Connecticut v. Johnson*, 460 U. S. 73 (1983), the plurality stated that "*Chapman* continued a trend away from the practice of appellate courts in this country and in England of 'revers[ing] judgments for the most trivial errors.'" *Id.*, at 82 (citation omitted). As the Court notes, the goal of the harmless-error rule is "'to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error.'" *Ante*, at 509 (citation omitted). *Chapman* also stands for the proposition that a criminal defendant is not entitled to reversal of his conviction if the constitutional violation at issue is subject to harmless-error analysis and, after the issue has been raised and the Government has carried its burden, the

---

[3] The Court noted that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error . . . ." 386 U. S., at 23. See *id.*, at 23, n. 8.

error is determined to be harmless within the meaning of *Chapman*. In this regard, the rule limits the remedies available to a criminal defendant whose rights have been violated, but it also advances the important social interest in not allowing harmless errors to upset otherwise valid criminal convictions.

The harmless-error rule announced in *Chapman* is based on important jurisprudential and social policies and generally should be applied to constitutional errors which it covers. This is not to suggest, however, that application of the harmless-error rule is a constitutional imperative; nothing in *Chapman* suggests that the rule always must be applied, or that convictions tainted only by harmless error never may be reversed. *Chapman* stands only for the proposition that certain constitutional guarantees do not *themselves* require reversal for harmless violations. If there is *other* authority, aside from the constitutional provisions violated in the case, that supports either a decision not to apply the rule or to reverse a conviction even though the error at issue is harmless, *Chapman* does not stand as a bar to such action. Federal statutes and state law are two such sources of authority.[4] In my view, the supervisory powers of federal appellate courts provide another possible source of authority, under some carefully confined circumstances, either to forgo a harmless-error inquiry or to reverse a conviction even though the error at issue is harmless.

In *McNabb* v. *United States*, 318 U. S. 332 (1943), the Court stated that "[j]udicial supervision of the administration of criminal justice in the federal courts implies the duty of

---

[4] See *Connecticut* v. *Johnson*, 460 U. S., at 88 (STEVENS, J., concurring in judgment) (*Chapman* "does not *require* a state appellate court to make a harmless-error determination; it merely *permits* the state court to do so in appropriate cases" (emphasis in original) (footnote omitted)). Similarly, Congress presumably could enact, consistent with the Constitution, a statute covering *Griffin* violations that would alter the rule in *Chapman*.

establishing and maintaining civilized standards of procedure and evidence." *Id.*, at 340. See also *Thiel* v. *Southern Pacific Co.*, 328 U. S. 217, 225 (1946). In *Cupp* v. *Naughten*, 414 U. S. 141 (1973), the Court suggested that within the federal court system an "appellate court will, of course, require the trial court to conform to constitutional mandates, but it may likewise require it to follow procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution." *Id.*, at 146. In *Mesarosh* v. *United States*, 352 U. S. 1 (1956), the Court observed: "This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings of the federal courts. If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted." *Id.*, at 14. See also *Communist Party* v. *Subversive Activities Control Board*, 351 U. S. 115, 124 (1956) ("The untainted administration of justice is certainly one of the most cherished aspects of our institutions"). Other cases have acknowledged the duty of reviewing courts to preserve the integrity of the judicial process. In *Donnelly* v. *DeChristoforo*, 416 U. S. 637 (1974), the Court stated: "We do not, by this decision, in any way condone prosecutorial misconduct, and we believe that trial courts, by admonition and instruction, and appellate courts, by proper exercise of their supervisory power, will continue to discourage it." *Id.*, at 648, n. 23. Finally, in *United States* v. *Payner*, 447 U. S. 727 (1980), the Court noted that "the supervisory power serves the 'twofold' purpose of deterring illegality and protecting judicial integrity." *Id.*, at 736, n. 8.[5]

---

[5] It is noteworthy that a majority of the Court in *Hampton* v. *United States*, 425 U. S. 484 (1976), a case involving the entrapment defense, suggested that supervisory powers possibly could be employed to bar conviction of a defendant based on outrageous police conduct even though the defendant might have been "predisposed." See *id.*, at 491, 493–495 (POWELL, J., concurring in judgment); *id.*, at 495, 497 (BRENNAN, J., dissenting).

These cases indicate that the policy considerations supporting the harmless-error rule and those supporting the existence of an appellate court's supervisory powers are not in irreconcilable conflict. Both the harmless-error rule and the exercise of supervisory powers advance the important judicial and public interest in the orderly and efficient administration of justice. Exercise of the supervisory powers also can further the strong public interest in the integrity of the judicial process. If Government prosecutors have engaged in a pattern and practice of intentionally violating defendants' constitutional rights, a court of appeals certainly might be justified in reversing a conviction, even if the error at issue is harmless, in an effort to deter future violations. If effective as a deterrent, the reversal could avert further damage to judicial integrity. Admittedly, using the supervisory powers to reverse a conviction under these circumstances appears to conflict with the public's interest in upholding otherwise valid convictions that are tainted only by harmless error. But it is certainly arguable that the public's interests in preserving judicial integrity and in insuring that Government prosecutors, as its agents, refrain from intentionally violating defendants' rights are stronger than its interest in upholding the conviction of a particular criminal defendant. Convictions are important, but they should not be protected at any cost.[6]

I have no occasion now to define the precise contours of supervisory powers or to explore the circumstances in which

---

[6] The case is made even stronger if we consider, as the discussion in text does not, the interests of criminal defendants in having their constitutional rights protected. Whether or not an error ultimately is determined to be harmless, a defendant's rights still have been violated. Criminal defendants have an even stronger interest in being protected from intentional violations of their constitutional rights, especially in view of the difficulties surrounding harmless-error inquiries. As the court noted in *United States* v. *Rodriguez*, 627 F. 2d, at 113, "[a] defendant's liberty should not so often depend upon our struggle with the particular circumstances of a case to determine from a cold record whether or not the prosecutor's remarks were harmless."

using them to reverse a conviction based on harmless error might be appropriate. This much, however, is clear: A court of appeals should exercise its supervisory powers to reverse a conviction based on harmless error only in the most extreme circumstances and only after careful consideration, and balancing, of all the relevant interests.[7]    The policies supporting the harmless-error rule announced in *Chapman* should be given considerable, but not controlling, weight in that balance.    In my view, there is nothing in *Chapman* that requires us to adopt a *per se* rule against using the supervisory powers to reverse a conviction based on harmless error. In light of the importance of the interests potentially at stake, it would be surprising if there were.[8]

---

[7] Although the interests of a victim in a particular case are not relevant to determining whether to enforce the established rights of a criminal defendant, see *Morris* v. *Slappy*, *ante*, at 28–29, n. 10 (BRENNAN, J., concurring in result), the interests of a victim may be relevant to determining whether to invoke the supervisory powers to reverse a conviction in a particular case even though the error is harmless.    Whether a continuing problem calls for the exercise of supervisory powers is a different question from whether a particular case is an appropriate context in which to exercise those powers.

[8] Like the Court, see *ante*, at 509–510, n. 7, I do not reach the question of whether 28 U. S. C. § 2111 is coextensive with *Chapman*.    In any event, I do not think that it necessarily forecloses the exercise of supervisory powers.