WISE, Presiding Judge.
 

 The appellant, James Michael Brannon, was indicted for two counts of capital murder for the killing of Bruce Pigg. Count I charged him with murder made capital because he committed it during the course of a kidnapping, § 13A-5-40(a)(4), Ala. Code 1975, and Count II charged him -with murder made capital because he committed it during the course of a robbery, § 13A-5-40(a)(2), Ala.Code 1975. Bran-non was convicted of two counts of felony-murder, a violation of § 13A-6-2(a)(3), Ala.Code 1975.
 
 [1]
 
 The trial court sentenced him to serve concurrent terms of forty years in prison. Brannon did not file any post-judgment motions. This appeal followed.
 

 The State presented evidence that the victim, Bruce Pigg, was the cousin of Heath York; that, in January 2006, Bran-non was living with York; that Heath Jarrett was a drug dealer; and that Pigg bought drugs from Jarrett. A few weeks before January 30, 2006, Pigg told York that four pounds of Jarrett’s marijuana was missing. Jarrett believed Pigg had taken the marijuana. About two weeks before January 30, 2006, there was an incident where Pigg was at Jarrett’s home and Jarrett would not let him leave. Jarrett let Pigg telephone his father, and Pigg told his father Jarrett would not let him leave unless he came up with $2,000 or $3,000. Pigg’s father telephoned York, York went to Jarrett’s residence, and Jarrett eventually released Pigg after Jarrett had Pigg sign something like an “IOU.”
 

 York testified that, on January 30, 2006, he, Brannon, Jarrett, Gabriel Moreno, and Derek Boyd were at Pisgah Bridge drinking and that Brannon, Jarrett, and Boyd talked about what they were going to do about Pigg and the missing marijuana. At some point, Jarrett said he would give someone money if they would bring Pigg to him, and Brannon said he would take Jarrett up on that offer. They all left and eventually went to Jarrett’s house. York testified that, while they were at Jarrett’s house, they decided they would get his vehicle stuck behind his trailer and then get Pigg to come pull him out.
 

 The State presented evidence that Bran-non, York, Jarrett, Moreno, and Boyd left and went to York’s trailer; that they got York’s vehicle stuck behind his trailer; that Brannon went to get Pigg; that Jarrett, Moreno, and Boyd hid in the woods; that Brannon came back in his vehicle; and that Pigg arrived driving his own vehicle. After Pigg got out of his vehicle, Jarrett attacked Pigg with a stick and asked about where his money was. Bran-non also started hitting Pigg with his fists. At one point, Pigg was on the ground, Brannon had a gun, and Brannon fired a shot between Pigg’s legs. The State also presented evidence that Jarrett used zip ties to bind Pigg’s wrists; that Jarrett and Brannon started putting Pigg into the back of Pigg’s vehicle; that Boyd was afraid they were going to break Pigg’s legs, so he helped them; that Brannon and Jarrett left the area in Pigg’s vehicle with Pigg; and that they went to Jarrett’s home.
 

 York testified that, some time later, Boyd picked him up and took him to Jarrett’s; that he got out and they said,
 
 “
 
 ‘He’s barely breathing’ ”; that he told
 
 *1102
 
 them they needed to take Pigg to the hospital; that somebody then said, “ ‘He’s dead’ that he told Boyd to take him home; that he later got his brother to take him to talk to law enforcement officers; and that he reported the incident to Chief Donald Baker of the Addison Police Department. (R. 54.)
 

 Boyd testified that, at some point after they put Pigg into the vehicle, he took Moreno to a friend’s house; that, as he was on his way home, he saw Pigg’s vehicle at Jarrett’s house, and he stopped; that he saw Pigg lying on his back in Jarrett’s back yard; and that Pigg was conscious, and Brannon and Jarrett were still kicking him around and yelling at him. He also testified that his cousin and her child lived with Jarrett; that between five and ten minutes after he arrived, his cousin pulled up with her child; that he went around front; that his cousin told him he had blood on his pants; that he went into the house, got his cousin to give him a pair of pants, and told his cousin to leave; that, when he came out of the house, Pigg was in the back of his vehicle; that Pigg was not conscious, but he was breathing and had a pulse; that he told Brannon and Jarrett they should take Pigg to a hospital, but they did not; that Brannon pulled his revolver and told him he was coming with them; that Jarrett got into Pigg’s vehicle; that he got into his vehicle, and Brannon got into the vehicle with the gun; that Brannon told him to follow Jarrett; that they ended up somewhere in Jasper; that Brannon and Jarrett made him help them take Pigg out of the vehicle and put him out in the woods; that Jarrett drove Pigg’s vehicle down some other back roads and left it; and that they picked up Jarrett and left. Boyd further testified that, ultimately, they stopped at the Econo Lodge motel in Good Hope; that Jarrett rented a room there, and they left Brannon at the room; that he dropped Jarrett off at Jarrett’s friend’s house; that, after he dropped off Jarrett, he telephoned his mother, got the telephone number for Baker, telephoned Baker, and said he was coming in to give him his statement; and that he later made a statement to Baker.
 

 Law enforcement officers subsequently went to the Econo Lodge and found Bran-non. When he was taken into custody, Brannon was wearing a camouflage jacket that had blood on it. Later, officers went to another residence and found Jarrett lying on a couch. At that time, they found a green jacket that had blood on it on the couch next to Jarrett. Forensic testing indicated that blood on the two jackets was consistent with Pigg’s DNA profile. Finally, the State presented evidence that law enforcement officers found Pigg’s vehicle in Walker County and that officers found Pigg’s body in a wooded area in Winston County.
 

 I.
 

 Brannon argues that the trial court erroneously admitted the camouflage jacket and the green jacket into evidence because the State did not establish an adequate chain of custody for them. However, during the trial, Crystal Kissel testified that she was previously the section supervisor for the forensic biology section of the Alabama Department of Forensic Sciences (“ADFS”); that she had received a box that contained paper bags containing various items of clothing; that one paper bag contained a camouflage jacket; and that another paper bag contained a green jacket. During her testimony, photographs of the jackets were admitted into evidence without objection. Kissel also testified, without objection, that there were areas on both jackets that were positive for blood and that forensic testing indicated that the blood on both jackets
 
 *1103
 
 was consistent with Pigg’s DNA profile.
 
 [2]
 
 Further, law enforcement officers testified, without objection, that Brannon was wearing a green camouflage jacket when he was taken into custody and that a green jacket was on the couch next to Jarrett when they found him. Therefore, the admission of the jackets was cumulative to the testimony of Kissel and the law enforcement officers. “[Evidence] that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.”
 
 White v. State,
 
 650 So.2d 538, 541 (Ala.Crim.App.1994), overruled on other grounds,
 
 Ex parte Rivers,
 
 669 So.2d 239 (Ala.Crim.App.1995). After reviewing the entire record as a whole, “it is “clear beyond a reasonable doubt that the jury would have returned a verdict of guilty” even without the admission of the actual jackets.
 
 United States v. Hasting,
 
 461 U.S. 499, 510, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).
 
 See also Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under these circumstances, error, if any, in the admission of the jackets was harmless.
 
 See
 
 Rule 45, Ala. R.App. P.
 

 II.
 

 Next, we must address the propriety of Brannon’s two felony-murder convictions. In
 
 Ex parte Rice,
 
 766 So.2d 143 (Ala.1999), the Alabama Supreme Court held that § 13A-6-2(a)(3), Ala.Code 1975, creates a single offense, even though it provides alternative methods of proving the offense. The supreme court also held that double jeopardy principles prohibit multiple convictions and multiple sentences for felony-murder if the convictions and sentences arise from a single killing. In this case, Brannon was convicted of one count of felony-murder during a kidnapping and one count of felony-murder during a robbery. Both convictions arose from the murder of Pigg. Therefore, Bran-non could not properly be convicted of and sentenced for two counts of felony-murder. The trial court sentenced Brannon to serve concurrent terms of forty years in prison. However, in
 
 Rice,
 
 the supreme court held:
 

 “We note that merely ordering that Rice’s sentences run concurrently is not a constitutionally acceptable option. The Supreme Court stated in
 
 Ball v. United States,
 
 470 U.S. 856, 864-65, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985):
 

 “‘The remedy of ordering one of the sentences to be served concurrently with the other cannot be squared with Congress’ intention. One of the convictions, as well as its concurrent sentence, is unauthorized punishment for a separate offense. See
 
 Missouri v. Hunter,
 
 459 U.S. 359, 368[, 103 S.Ct. 673, 74 L.Ed.2d 535] (1983).
 

 “ ‘The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence. The separate
 
 conviction,
 
 apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. For example, the presence of two convictions on the record may delay the defendant’s eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant’s credibility and certainly carries the societal stigma accompanying any criminal conviction. See
 
 *1104
 

 Benton v. Maryland,
 
 395 U.S. 784, 790-91[, 89 S.Ct. 2056, 23 L.Ed.2d 707] (1969);
 
 Sibron v. New York,
 
 392 U.S. 40, 54-56[, 88 S.Ct. 1889, 20 L.Ed.2d 917] (1968). Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.’
 

 “See, also,
 
 Rolling v. State,
 
 [673 So.2d 812 (Ala.Crim.App.1995) ].
 

 “Neither is it an acceptable option to merely vacate one of Rice’s convictions and its corresponding sentence. The jury specifically found that Rice had violated § 13A-6-2(a)(3) in two different ways — by participating in a kidnapping and causing Taylor’s death and by participating in a robbery and causing Taylor’s death. Based on the record before us, an appellate court’s vacating one of Rice’s convictions and its corresponding sentence would have the effect, albeit unintended, of nullifying a part of the jury’s verdict. We think the better approach is for the Court of Criminal Appeals to remand the case to the trial court for the entry of a new order — an order that adjudges Rice guilty of Taylor’s murder and sentences him for that single offense.”
 

 Rice,
 
 766 So.2d at 152-53. Therefore, Brannon’s convictions for two counts of felony murder cannot stand. Accordingly, we remand this case for the trial court to enter a new order that adjudges Brannon guilty of Bigg’s murder and sentences him for that single offense. The trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 42 days after the release of this opinion.
 

 REMANDED WITH INSTRUCTIONS.
 
 *
 

 WELCH, WINDOM, KELLUM, and MAIN, JJ., concur.
 

 [1]
 

 . At the beginning of the trial, the trial court noted that the State was not trying the case as a capital case and that the trial would involve the felony-murder charges.
 

 [2]
 

 . Brannon had previously filed a pretrial motion to suppress evidence in this case. However, the trial court did not rule on that motion before trial. Further, Brannon did not raise the issue of the motion to suppress until the day after Kissel had testified.
 

 *
 

 Note from the reporter of decisions: On August 13, 2010, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On August 27, 2010, that court denied rehearing, without opinion. On October 8, 2010, the Supreme Court denied certiorari review, without opinion (1091687).