28 F.3d 1214
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joseph C. SAADE, Petitioner-Appellant,
v.
David TRIPPETT, Respondent-Appellee.
 No. 93-1739.
 United States Court of Appeals, Sixth Circuit.
 July 12, 1994.
 
 Before NELSON and NORRIS, Circuit Judges, and ENGEL, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is an appeal from the denial of a petition for a writ of habeas corpus. The petitioner, who was convicted in a state court of second-degree murder, contends that his federal constitutional rights were violated when a police detective, called to testify as one of a number of witnesses for the prosecution, invaded the province of the jury by stating on redirect examination that he was "pretty well satisfied" that he had the right person when he arrested the petitioner.
 
 
 2
 On direct appeal of the conviction, a state court of appeals declared that because the petitioner had objected to the offending question only after the witness had given his answer, and because the specific ground stated as the basis for the objection was not the ground that ought to have been stated, the assignment of error could only be sustained if manifest injustice were found. Finding no manifest injustice, the court affirmed the conviction.
 
 
 3
 In the federal habeas proceeding, which was initiated after the state supreme court had denied review, a magistrate judge recommended dismissal of the petition on the ground that the trial court's error, if error it was, had not so infected the trial with unfairness as to make the resulting conviction a denial of due process. The district judge agreed that the petition should be dismissed, but rested his decision on the ground that state appellate review had been barred by a procedural default that would preclude federal habeas review absent a demonstration of "cause" for the default and actual prejudice as a result.
 
 
 4
 We are somewhat dubious about the district court's procedural default analysis, and we are at a loss to understand how the state court of appeals could have thought that the trial court's handling of the objection to the detective's testimony was anything other than patently erroneous. We conclude, nonetheless, that the error was not one that can be redressed in federal habeas proceedings, and we shall affirm the dismissal of the petition.
 
 
 5
 * Early in the morning of May 12, 1987, police officers in Flint, Michigan, arrested the petitioner, Joseph Saade, on suspicion that it was he who had shot and killed a man named Chester Thompson a few hours before. The police did not find a smoking gun in Mr. Saade's hand, but locked in a filing cabinet in the Saade residence they did find a weapon subsequently identified by a state police crime laboratory as the gun with which Chester Thompson had been shot. Mr. Saade and his wife had the only keys to the filing cabinet.
 
 
 6
 At a preliminary examination conducted before a state court judge on June 3, 1987, two witnesses--Victor Jones and John Crowder--testified that they had been with Mr. Thompson in his home when the shooting occurred on the evening of May 11. Mr. Crowder identified Joseph Saade as the man who had done the shooting, and the judge ordered Mr. Saade bound over on a charge of first-degree murder.
 
 
 7
 The case went to trial on November 10, 1987. The jury proved unable to reach a verdict, and a new trial was begun on March 29, 1988. Among the facts brought out at the second trial were these.
 
 
 8
 Mr. Saade, who was 26 years old at the time of the second trial, was born in Beirut, Lebanon. He came to this country in 1981 on a student visa and went to school in Boston, Massachusetts. There he met an African-American woman named Gezell Townsend, whom he married in 1984. Gezell had been laid off from a job at a General Motors plant in the Flint area, but she was recalled in 1985. She and Mr. Saade moved to Flint at that time.
 
 
 9
 Gezell had a friend named Jacqueline Thompson, with whom she had sometimes smoked marijuana at work. On the afternoon of Saturday, May 9, 1987, Jacqueline and her estranged husband, Chester Thompson, went to the Saades' house. Jacqueline testified that the purpose of the visit was to buy cocaine from Gezell Saade. The latter denied that she ever sold drugs to Jacqueline Thompson, and Mr. Saade testified that to his knowledge there had never been drugs in his household. "I don't use no drugs," he told the jury, "and I don't sell no drugs." Mr. Saade acknowledged, however, that the Thompsons had in fact come to his house on May 9 to see Gezell Saade.
 
 
 10
 When the Thompsons left, according to Jacqueline Thompson's testimony, Chester showed her a .25 caliber handgun which he said he had stolen from the top of the refrigerator in the Saades' house. He told her that he was going to sell it or trade it for drugs.
 
 
 11
 Jacqueline Thompson returned to the Saades' house several times on Monday, May 11, and discussed the stolen gun with Mr. and Mrs. Saade. Joseph Saade asked her if she could get the gun back, according to Jacqueline's testimony, and she said she would try. She further testified that Joseph Saade left the house for a time and told her, after his return, not to worry about the gun any more because "its already been taken care of." When Mr. Saade came back, she said, he had a big gun with him, "about like a .357."
 
 
 12
 A man named Willie Jones, whose mother had a house across the street from the house where Chester Thompson lived, testified that sometime between 9:00 and 10:00 on the evening of May 11, while sitting in a recliner in his mother's house, he saw a dark colored car drive up and park two doors away from Chester Thompson's house. The headlights had been turned off, which made Willie Jones a little suspicious, and Jones got up to watch. He saw a light-skinned man with curly, bushy hair leave the car, walk up to Thompson's house, and knock on the door. Thompson opened the door, and the man went inside.
 
 
 13
 Willie Jones' brother, Victor Jones, testified that he and a cousin, John Crowder, were with Chester Thompson in his dining room at the time. Thompson heard a knock and went to the door. Then Victor Jones saw Thompson "fly back into the dining room." He was being pushed, said Jones, by a man holding a long, silver-colored gun.
 
 
 14
 The gunman was asking Thompson "real serious like," according to Jones, "where his stuff at or something." Jones was told to put his head down and be quiet, which he did. He heard a shot at some point, and the man then pushed Thompson off a bar stool on which he had been sitting. After the shooting, Jones heard the man say to Thompson "I should have killed you."
 
 
 15
 Victor Jones further testified that the intruder had an accent like that of the Arabs who worked in local stores. He said that he subsequently described the man to the police as being light-skinned, using the words "Mexican, Puerto Rican" in this connection. Jones made an in-court identification of Joseph Saade as the gunman.
 
 
 16
 On cross-examination, Mr. Saade's lawyer directed Jones' attention to testimony he had given at the preliminary examination to the effect that he "didn't see [the gunman] that good" and "really didn't see his face that day." Jones had seen Mr. Saade at the preliminary examination and thought he had testified "that could have been him." With respect to the gunman's accent, it was brought out, Jones testified at the preliminary examination as follows:
 
 
 17
 "It was, you know, like Mexican or Puerto Rican or people like, you know, stores. You go to stores, you know, it was a funny voice, you know."
 
 
 18
 Jones had also described the gunman as "a light-skinned guy" with curly hair.
 
 
 19
 John Crowder, the cousin of Willie and Victor Jones, testified that he and Victor had gone to Chester Thompson's house at around 9:30 or 10:00 on the night of May 11. Crowder likewise described a knock at the door and Thompson's being pushed back into the dining room by a man with a nickel-plated gun. As he had done at the preliminary examination, Crowder identified the defendant, Joseph Saade, as the man he had seen. He testified that the man kept asking Chester Thompson for a gun, and Thompson, addressing the intruder by name, said "Joseph, I don't have it."
 
 
 20
 After the shooting, Crowder testified, the gunman pushed Thompson off his bar stool "and asked him a few more times where his gun was at." The man then pointed the gun he was holding at Crowder and asked, "Who's next?" Crowder's response, he testified, was, "Hey, I don't even really know this guy. I just met him. I don't have nothing to do with what you're doing." The man then walked out of the house, and Crowder heard a car drive off.
 
 
 21
 Crowder testified that the gunman looked like an Arab and had a mustache and curly hair. He conceded on cross-examination that he had mistakenly told the police the man had blond hair, but on redirect he said that there was no doubt in his mind that Joseph Saade was the killer. Crowder admitted to a felony conviction for possession of narcotics, an offense for which he was serving probation.
 
 
 22
 Victor Jones testified that after checking Chester Thompson and observing blood in the area of his shoulder and chest, he and Crowder went to the home of Thompson's parents and told his brother, Asive, that Chester had been shot. John Crowder told Asive Thompson that it was an Arab who had done the shooting.
 
 
 23
 Asive Thompson, who testified that it was Victor Jones who told him Chester had been shot by an Arab, said that he went to Chester's house with his father and found Chester lying face down in the dining room. The father called the police and an ambulance. Thompson was taken to a local hospital, where he died that evening.
 
 
 24
 A pathologist who performed an autopsy on Thompson's body testified that there was a gunshot wound on the right shoulder. He described the wound as a "contact wound" with powder and a muzzle imprint around it, indicating that the weapon "was held on top of the target." The bullet, which was recovered from the body and turned over to the police, had gone through the armpit and into the lung, causing the victim's death. The bullet was received in evidence as "People's Exhibit 1."
 
 
 25
 Several Flint police officers took the stand, including the detective sergeant in charge of the investigation, Gary Elford. Sgt. Elford (through whom it was established that it took six minutes to drive from the Saades' house to Chester Thompson's house) testified that he had been called in on the case shortly after 11:00 p.m. on May 11. He had immediately gone to the hospital to see if he could talk to the victim. Chester Thompson had been pronounced dead by the time the officer reached the hospital, but Jacqueline Thompson was there. Based on information received from her and from John Crowder and Willie Jones, Sgt. Elford testified, Joseph Saade was brought in for questioning. This occurred within a couple of hours after the shooting.
 
 
 26
 A search warrant was obtained for Mr. Saade's house, and the police executed the warrant at about 7:00 a.m. on May 12. They were looking for a handgun, and such a weapon was found in a locked file cabinet in an upstairs bedroom. Gezell Saade, who had told Sgt. Elford where to find the gun, opened the cabinet for him, the officer testified. The weapon in question, a .357 caliber magnum revolver manufactured by Smith & Wesson, bore serial number 4D62611. The weapon was registered to Mr. Saade, as was a .25 caliber Raven Arms automatic. (The .25 caliber gun was never recovered.) Sgt. Elford testified that he personally took the .357 magnum and the bullet removed from Chester Thompson's body to the state police crime laboratory in Bridgeport.
 
 
 27
 (Before Sgt. Elford took the stand, a firearms expert from the crime laboratory had testified that the markings on the spent bullet identified as People's Exhibit 1 showed that it had been fired from the .357 magnum bearing serial number 4D62611. The witness testified that the weapon had not gone through the latent fingerprint unit as far as he knew. The witness further testified that residue lifted by swabs from the hand of someone who had fired a gun of this type within five hours could show that he had recently discharged a weapon. The witness also stated that there could be a transfer of blood from the victim to the shooter if the victim were fired on from very close range.)
 
 
 28
 Under cross-examination, Sgt. Elford acknowledged that John Crowder had initially told him the shooter was a blond guy. The officer acknowledged that in the first police statement taken after the shooting it was reported that Victor Jones and John Crowder had told Chester Thompson's father and brother that Gezell's husband, the Arab, had shot Chester--a curious thing for Jones and Crowder to say, since neither of them had ever met Gezell's husband. The officer further acknowledged that he had seen no blood on Mr. Saade's clothing. In looking for the gun in Mr. Saade's house, moreover, he had not looked for clothing with blood on it. An examination of Mr. Saade's automobile, a full-sized dark blue car, had disclosed no blood or other physical evidence. Although Jacqueline Thompson had told the sergeant that Joseph Saade had hidden something in the back yard after returning to his house on the evening of May 11, the police found nothing in the back yard "after walking a few feet out there." No testing was done for blood on Mr. Saade's person, and his hands were not tested for powder residue from firing a weapon: "The gun residue kit," Sgt. Elford admitted, "I did not try that on Mr. Saade." And the record contains no mention of any fingerprints on Mr. Saade's .357 magnum.
 
 
 29
 The prosecution attempted to rehabilitate Sgt. Elford on redirect by asking this question:
 
 
 30
 "Q. Sergeant, in comparison with this case and other cases that you have had to deal with, you were pretty well satisfied that you had Mr. Saade as the person who had killed Mr. Thompson, is that correct?"
 
 
 31
 Sgt. Elford's response, "[t]hat's correct," was followed by an objection from Mr. Saade's lawyer, Mr. McCombs:
 
 
 32
 "MR. McCOMBS: I object, your Honor, that's calling for a conclusion. It's patently improper testimony to seek from this witness.
 
 
 33
 THE COURT: Which rule does it violate?
 
 
 34
 MR. McCOMBS: It's calling for a conclusion.
 
 
 35
 THE COURT: He's not able to offer a conclusion as a police officer?
 
 
 36
 MR. McCOMBS: That's right. I believe that that's a conclusion that is going to have to be arrived at by this jury." (Emphasis supplied.)
 
 
 37
 The trial judge then denied the objection, expressing himself as follows:
 
 
 38
 "THE COURT: That's true. But I believe the question was asked in light of his background and experience, and under 702 anyone who is qualified by background or experience can offer an opinion. So if that's the objection, I'm gonna overrule you."
 
 
 39
 The jury was excused for its afternoon break shortly thereafter, and a discussion ensued between court and counsel about the remaining witnesses and their exhibits. In the course of the discussion the judge himself brought up the objection to the question asked Sgt. Elford on redirect:
 
 
 40
 "THE COURT: Okay. As for the objection that was made at the last exchange, I think that the question was objectionable. However, not for the reasons that were stated and that was the basis on which I overruled the objection.
 
 
 41
 MR. McCOMBS: Well, it certainly was wrong. There's no question in my mind about that.
 
 
 42
 THE COURT: Well, you have to make the right objection.
 
 
 43
 MR. McCOMBS: I guess I'm just not sharp enough to handle this type of work.
 
 
 44
 THE COURT: I wouldn't say that.
 
 
 45
 MR. McCOMBS: I would hate to see something improper going into evidence because I didn't name it properly.
 
 
 46
 THE COURT: I don't know what you're talking about.
 
 
 47
 MR. McCOMBS: Well, you said that it's objectionable, but for reasons other than those that I have stated.
 
 
 48
 THE COURT: That's right, and that's not my function to state the rule. That's your function. And, I'll be happy to give you a ruling based on the rules. That's why I asked you what was the basis."
 
 
 49
 At no time did the trial judge indicate that he was overruling the objection on the ground that it was untimely; it is clear that he overruled it because he did not think that the lawyer had stated a proper reason for the objection.
 
 
 50
 After the prosecution presented its final two witnesses and rested its case, the defense called as its first witness Gezell Saade. Mrs. Saade testified that she and her husband had gone to a neighborhood store together at about 8:30 p.m. on May 11. Otherwise, Mrs. Saade said, Mr. Saade had been in the house all evening until the police took him away. She testified that Jacqueline Thompson had come over to the house at about 8:00 and had told Mrs. Saade that she was concerned that she would be blamed for the missing gun. Jacqueline left at about 8:20 and returned at around 10:00. Again the two women talked about the gun that was missing, and at Jacqueline's request Mrs. Saade called her husband up from the basement so Jacqueline could speak with him.
 
 
 51
 Joseph Saade testified that Jacqueline told him at around 10:30 p.m. that somebody--she did not say who--had stolen the .25 caliber gun. Mr. Saade said that he was unaware, until that point, that the gun had been taken. Mrs. Thompson told him she could get the gun back for $25.00, and he replied that he was willing to pay $25.00 because the gun was registered in his name and he did not want it to get into the wrong hands. Mr. Saade denied having shot Chester Thompson, and testified that he did not even know where Mr. Thompson lived.
 
 
 52
 Gezell Saade's 13-year-old sister, Melinda Townsend, and Gezell's 10-year-old son, Corey Townsend, both testified that they had remained in the Saade house on May 11 after it began to get dark. Mr. Saade never left the house, they said, except for a short time when he and his wife went to the store together.
 
 
 53
 The final witness for the defense was Doris Robinson, who had previously been called by the prosecution. Mrs. Robinson, a neighbor of Chester Thompson's, remembered a girl in a pink dress running across the street at some point on May 11, probably after Mrs. Robinson heard a shot. She testified that she had given the police a statement in which she said this:
 
 
 54
 "It was right around 9:45 and ten o'clock, I heard what I thought was 3 voices in the street. And they was yelling at each other. I heard one gunshot and I ran out of my house to see what was going on. I saw this black chick running towards that school over there. Then I hear somebody say that the bitch ain't gonna get away with that shit this time. That's all I heard and I didn't really want to hear that."
 
 
 55
 Mrs. Robinson had been drinking that night, she testified, and really did not know what time it was when the incident occurred; it "could have been early [and] ... could have been late."
 
 
 56
 In closing argument Mr. Saade's lawyer submitted that taking the prosecution's case at its very best, "you have no intended or premeditated murder." Moreover, he argued, there had been no showing that Joseph Saade's fingerprints were on the .357 magnum, no evidence that Mr. Saade knew where Chester Thompson lived, and no evidence of any blood on Mr. Saade or his clothing or in his car. The lawyer further suggested that Jacqueline Thompson, whose domestic situation was an unhappy one, had a far stronger motive to murder Chester Thompson than Joseph Saade did. Jacqueline, he implied, was the "black chick" Doris Robinson had seen running outside Chester's house after the shot was fired at around 9:45. The lawyer argued that the alleged eye-witnesses knew who it was they wanted to identify--Gezell Saade's Arab husband--but could not do a good job of describing him to the police because they did not know what he looked like. The prosecutor, in his rebuttal, argued that the most important question was "how did [Joseph Saade's] gun get out of the file cabinet, shoot Chester Thompson[,] and then get back into [the] file cabinet?"
 
 II
 
 57
 The jury evidently accepted the argument that Mr. Saade had not been shown to have intended Chester Thompson's death--an argument strengthened by the testimony that the assailant had said "I should have killed you"--but the jury evidently rejected the theory that Jacqueline Thompson had committed the crime with Mr. Saade's .357 magnum, had prevailed upon Willie and Victor Jones and John Crowder to lie about what they had seen, and had somehow managed to get the weapon into the locked filing cabinet in the Saade's house after the shooting. Mr. Saade was found guilty of second-degree murder and received a sentence of 14 to 30 years in prison for that crime. He was also convicted of possession of a firearm during a felony, a crime for which he received a consecutive sentence of two years.
 
 
 58
 On appeal to the Michigan Court of Appeals, Mr. Saade raised three issues. His third argument (the only one relevant here) was that he had been denied due process of law under the Michigan and federal constitutions by prosecutorial misconduct that included asking the detective in charge to compare the strength of the evidence in this case with the strength of evidence in other cases he had investigated. Mr. Saade contended that the detective's answer to this improper question made the trial unfair in a constitutional sense.
 
 
 59
 The court of appeals affirmed the conviction, rejecting the third assignment of error by a vote of two to one. The majority opinion said that the objection to the question had not been timely, as required by Rule 103(a)(1) of the Michigan Rules of Evidence. (That rule, as quoted by the court, requires "a timely objection or motion to strike ..., stating the specific ground of objection, if the specific ground is not apparent from the context.") The majority opinion then continued as follows:
 
 
 60
 "The basis for the belated objection raised by the defendant was that the question required an opinion as to the ultimate issue in the case. Under the Michigan Rules of Evidence, however, an expert may render an opinion on the ultimate issue so long as such an opinion would be helpful to the trier of fact. MRE 704. Such an opinion must be within the field of expertise of the witness, and supported by a proper foundation. MRE 702. In the present case, the question was not objectionable because it called for an opinion or conclusion but because it was without an adequate foundation. In addition, although the lower court later acknowledged that the question had been improper, defendant neither moved to strike the testimony nor requested a curative instruction.
 
 
 61
 "Under these circumstances, we will review the alleged error only to prevent manifest injustice. People v. Fredrick Lester, 78 MichApp 21, 32; 259 NW2d 370 (1977), rev'd on other grounds 406 Mich 252 (1979). Upon review of the record in its entirety, we find the evidence of guilt to be overwhelming and that no manifest injustice occurred by the testimony.
 
 
 62
 "As noted by the prosecutor, even before the detective in charge testified, the jury was likely to have assumed that the detective was 'pretty well satisfied' that the defendant was the person who killed the victim; otherwise the case against the defendant would never have been brought. Minimal prejudice, if any, occurred from the detective in charge stating the obvious. Additionally, we note that the statement was never repeated nor mentioned during the remainder of the trial. We find no miscarriage of justice. MCL 796.26; MSA 28.1096."
 
 
 63
 Judge Shepherd, who dissented, expressed himself as satisfied that the objection was timely:
 
 
 64
 "It came immediately after the answer and we have no indication in the record that a long period of time elapsed between the words, '... is that correct?' and 'That's correct.' Must the outcome of a case turn on whether counsel can insert an objection within a fraction of a second it takes to answer such a question? I think not. For this reason I believe we should review this case for error and not for manifest injustice."
 
 
 65
 Judge Shepherd went on to point out that Mr. Saade's lawyer had "stated that the question calls for a conclusion that has to be arrived at by the jury," a statement sufficiently precise to satisfy the requirement that the specific ground of objection be stated. "In any event," the judge continued, "it is obvious that the question asks the witness to state an opinion on defendant's guilt and the trial court should have no problem in making a correct ruling the instant the objection was made. * * * The issue of an individual's guilt or innocence is a question solely within the province of the jury. People v. Suchy, 143 MichApp 136, 149; 371 N.W.2d 502, lv den 424 Mich 855 (1985)." Accordingly, and because the credibility of two sets of witnesses was critical here, because Judge Shepherd was satisfied that a request for a curative instruction or motion to strike would have been useless, and because he was concerned about the effect an affirmance would have on the administration of the criminal justice system,[1] he said that he would have remanded the case for a new trial.
 
 
 66
 The Michigan Supreme Court denied leave to appeal, over the dissent of three members of the court, and Mr. Saade then commenced the federal habeas proceeding described at the outset of this opinion.
 
 III
 
 67
 The Supreme Court of the United States has repeatedly declared that it is not the province of a federal habeas court to reexamine state court determinations on state law questions. Estelle v. McGuire, 112 S.Ct. 475, 480 (1991), citing Lewis v. Jeffers, 497 U.S. 764, 780 (1990) and Pulley v. Harris, 465 U.S. 37, 41 (1984). Thus it is that erroneous state court rulings on evidentiary questions are not cognizable in federal habeas corpus proceedings "unless they render the trial so fundamentally unfair as to constitute a denial of federal rights." Logan v. Marshall, 680 F.2d 1121, 1123 (6th Cir.1982) (citation and internal quotes omitted).
 
 
 68
 If it were up to us to say whether the legal analysis employed by the Michigan courts was erroneous as a matter of state law, we should not hesitate to say that it was indeed erroneous. As the state trial judge himself recognized, after a few minutes for reflection, the question put to Sgt. Elford on redirect was objectionable. It was objectionable, in our view, not because it lacked an adequate foundation, but because it improperly invaded the province of the jury--a ground that should have been apparent from the context, and one that Mr. Saade's lawyer specifically called to the trial court's attention in any event. Although Michigan Rule of Evidence 704 may have relaxed, in other contexts, the common law prohibition against allowing an expert witness to invade the province of the jury, common sense and the traditions of the criminal law, to say nothing of state and federal constitutional considerations, strongly suggest that an expert witness ought not be permitted to tell the jury that "the defendant, in my opinion, is guilty." The trial judge did not treat the objection as having come too late, finally, and it seems to us that he clearly ought to have sustained the objection and instructed the jury to disregard the witness' answer.
 
 
 69
 If the failure of the trial judge to follow that course did not violate Michigan law, it does not necessarily follow that Mr. Saade received a fair trial as a matter of federal constitutional law. We would have no power to resolve the latter question in Mr. Saade's favor, however, if, as the district court believed, the state court of appeals applied a valid state procedural rule to bar consideration of the federal constitutional claim, and if, as the district court also believed, Mr. Saade could not demonstrate either (1) "cause" for his failure to comply with the procedural rule and prejudice attributable thereto, or (2) a "fundamental miscarriage of justice." See Coleman v. Thompson, 501 U.S. 722 (1991); Engle v. Isaac, 456 U.S. 107 (1982); Wainwright v. Sykes, 433 U.S. 72 (1977).
 
 
 70
 The district court's procedural default analysis strikes us as problematic for several reasons. It is not clear to us, for one thing, that the Michigan Court of Appeals declined to address the merits of Mr. Saade's federal constitutional claim. As a matter of substantive law, the court did hold that a new trial was not necessary to prevent "manifest injustice," and the court went on to cite a federal constitutional case, Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986), in support of the proposition that Mr. Saade "was entitled to a fair trial, not necessarily a perfect one." The Michigan Court of Appeals then concluded that "Defendant [Saade] received a fair trial." That proposition would be irrelevant, of course, if the court were declining, on procedural grounds, to consider Mr. Saade's constitutional claim.
 
 
 71
 A state procedural default bars federal habeas review, moreover, only if the procedural rule in question is "firmly established and regularly followed." Ford v. Georgia, 498 U.S. 411, 424 (1991). It would be somewhat surprising if Michigan courts of appeals regularly declined substantive review under circumstances comparable to those presented here.
 
 
 72
 It is unnecessary for us to decide whether the granting of federal habeas relief would be barred procedurally in this case, however, because we are satisfied that Mr. Saade is not entitled to such relief in any event. We agree with the Michigan Court of Appeals that Mr. Saade received a fair trial, and we agree with the federal magistrate judge that the prosecutor's mistake "was harmless error[,] given the overwhelming evidence of guilt in this case."
 
 
 73
 It is true, as Judge Shepherd pointed out in his eloquent dissent, that Mr. Saade had several alibi witnesses. Two children who were watching television in the Saade house said that Mr. Saade did not leave, and his wife said the same thing. They could easily have been mistaken, however--Mr. Saade was not in the same room with any of them for much of the evening--and if Mr. Saade had slipped out for half an hour, it is by no means clear that anyone would have noticed.
 
 
 74
 It is also true that Mr. Saade claimed not to have known until after Mr. Thompson had been shot that the .25 caliber pistol had been stolen. It is undisputed, however, that Jacqueline Thompson talked to Mrs. Saade about the stolen pistol between 8:00 and 8:20 p.m., and it is undisputed that Mr. and Mrs. Saade then walked to the store together ten or fifteen minutes later. Neither of the Saades testified as to what they talked about during their walk, and Mrs. Saade offered no explanation of why she would not have told her husband that she had just learned the pistol had been stolen.
 
 
 75
 Willie Jones testified that it was a man who went to Chester Thompson's house sometime between 9:00 p.m. and 10:00 p.m., not a woman, and Victor Jones and John Crowder consistently said that the assailant was a man. Unlike the members of Mr. Saade's family, they cannot be said to have had any apparent motive to lie. John Crowder consistently identified Joseph Saade as the man he had seen in Chester Thompson's house at the time of the shooting, and while Victor Jones' visual identification of Mr. Saade may have been suspect, Jones consistently maintained that the assailant was a man with a foreign accent.
 
 
 76
 At one point in the trial Mr. Saade's lawyer promised to give the jury an explanation of how the weapon with which Chester Thompson had been shot came to be found in the Saades' file cabinet. He never made good on that promise in any explicit way, but by pointing a finger at Jacqueline Thompson during final argument, he implied that she stole the .357 magnum from the Saade's house, shot her husband with it, and then returned to the house and put the weapon in the file cabinet. There is uncontradicted testimony that the file cabinet was locked when the police executed their search warrant the next morning, however, and Mr. and Mrs. Saade had the only keys. The jury was offered no theory as to how Jacqueline Thompson could have locked the gun in the cabinet. Viewing the record as a whole--and we have examined it with some care--it seems to us that the evidence of Mr. Saade's guilt truly is overwhelming, just as the Michigan Court of Appeals said it was.
 
 
 77
 The question that the prosecutor asked Sgt. Elford on redirect, after a cross-examination in which the officer acknowledged his failure to test Mr. Saade's hands for powder residue, was an isolated incident in a trial that lasted several days. Sgt. Elford gave his testimony on March 31, a Thursday, and the jury did not start its deliberations until the following Tuesday afternoon, April 5. The objectionable testimony is not likely to have been uppermost in the jury's mind.
 
 
 78
 It is hardly a startling proposition that Sgt. Elford would not have made the arrest if he had not been pretty well satisfied that it was Mr. Saade who had killed Mr. Thompson, and we have no reason to suppose that the jury considered the sergeant's opinion critically important. The matter was not brought up in final argument or at any other point in the trial.
 
 
 79
 The jury was fully instructed by the trial judge on the presumption of innocence, moreover, and the members of the jury were told to start their deliberations with the presumption of innocence foremost in their minds. "The fact that the defendant was arrested and is on trial," the instructions continued, "is no evidence against him."
 
 
 80
 Although Mr. Saade did not receive a perfect trial, we think his trial was a fair one--and a fair trial, as the Michigan Court of Appeals recognized, is all that he was entitled to under the United States Constitution. Van Arsdall, 475 U.S. at 681. See also Rose v. Clark, 478 U.S. 570, 578-79 (1986); United States v. Hasting, 461 U.S. 499, 508 (1983). In the context of the evidence offered at trial, we do not believe that the single question and answer at issue here--five lines of text in a trial transcript of more than 500 pages--"so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." See Darden v. Wainwright, 477 U.S. 168, 181 (1986).
 
 
 81
 The district court was correct in denying a writ of habeas corpus in this case. The denial of the writ is AFFIRMED.
 
 
 82
 ENGEL, Senior Circuit Judge, concurring.
 
 
 83
 I concur in affirmance here for two rather straightforward reasons. First, under the circumstances of this case, I do not believe any questions of federal constitutional or statutory magnitude are involved in this case. I therefore agree with the comment of our court in Logan v. Marshall, 680 F.2d 1121, 1123 (6th Cir.1982), that "all that is involved in this action is an evidentiary ruling by a state trial court judge. It is not this court's function to supervise courts of the State of Ohio." If left totally uncorrected there might have been some argument that the ruling of the trial judge resulted in unfairness, but it did not do so here, when one views the trial as a whole and the judge's instructions given throughout the trial and at the conclusion. To the extent there may have been any error, I would conclude that it was fully and satisfactorily cured by the instructions which the trial judge gave, even though these came at the end of the trial and not immediately following the admission of the challenged evidence. The jury were fully instructed on the burden of proof and the trial judge also specifically instructed that "the fact that the defendant was arrested and is on trial is no evidence against him." After hearing this instruction, the very comment elicited of Sergeant Elford must have been seen by the jury as irrelevant to its own determination of Saade's guilt or innocence. It had to be apparent to the jurors as it would be to the world in general that an individual is not going to be put on trial unless some law enforcement officer is "pretty well satisfied" that the accused committed the crime. Nothing more was said by Sergeant Elford, and the remark was neither repeated nor dwelt upon. Any remote prejudice from it was certainly erased by the over-all instructions given by the court. I believe my analysis, and our decision here, is supported both by Logan v. Marshall, supra, and Darden v. Wainwright, 477 U.S. 168, 181 (1986).
 
 
 
 [1]
 "Are we to say that in every case where alibi or witness credibility are issues, the prosecutor can ask the officer his opinion on whether he thinks he has the right defendant? The prosecution can, under today's ruling, do precisely that and then argue that since some witnesses other than the officer had testified to defendant's guilt, the error, if any, is harmless. The presumption of innocence is gone, the prosecution's burden of proof has been shifted to the defendant and many truly innocent defendants will be doomed from the start."