DECISION.
Appellant Johnny S. Fields was found guilty by a jury of aggravated robbery[1] with a gun specification, robbery,[2] resisting arrest,[3]
and tampering with evidence.[4] The trial court sentenced him to seven years' incarceration, and Fields appeals, raising six assignments of error. We overrule Fields's assignments of error and affirm his conviction and sentence.
Kamel Sawadeh and his son, Ali Kamel Sawadeh, were working in their family-owned deli and convenience store when a large black man wearing a gray sweatshirt entered the store. A red bandana concealed the man's facial features.
Ali Kamel Sawadeh was standing behind the counter at the store's cash register when the man thrust what appeared to be a small black gun into his face and ordered him to open the register. Sawadeh complied, and the man reached over the counter and grabbed a handful of bills.
Unfortunately for the robber, the Sawadehs' store had been selected earlier by a special police task force to receive some unique equipment. Taking the money from the register triggered the operation of a surveillance camera, as well as a silent alarm that directly notified the police that a robbery was taking place. The money taken from the register included several two-dollar bills purposely placed in the register for later identification by a police officer who had transcribed his badge number on the bills.
The police responded within seconds. The first officer to arrive testified that he saw the large man with the gray sweatshirt and red bandana running with a noticeable limp as he emerged from the store. He attempted to apprehend the suspect, but the man ran behind a garage. The officer elected to wait for other officers to arrive so he did not follow the man behind the garage. But a few seconds later, according to the officer, Fields emerged from behind the garage.
The officer testified that Fields was wearing a black T-shirt rather than a gray sweatshirt, but that he had a red bandana across his face. He fit the build of the suspect and similarly limped. The officer, gun drawn, ordered Fields to the ground. Fields did not initially comply with the officer's demands, choosing instead to curse at the officer, to continue walking, and then finally to stop, only to make quick hand movements towards his pants that the officer interpreted as possibly reaching for a gun.
As other officers arrived, a struggle ensued and Fields was eventually handcuffed. By this time, a police canine unit had also arrived. The dog found a gray sweatshirt wrapped around money from the robbery behind the garage where Fields had emerged. No gun was ever found.
The police arrested Fields and took him to a police station where they placed him in a cell. At the time, he was still wearing a red bandana around his neck. Video surveillance cameras from the police station revealed that Fields took the bandana off and flushed it down the toilet in the cell.
Fields's version of the events was significantly different. He testified that on the night of the robbery he had just walked outside onto his porch when he saw an unidentified man hurl himself over a fence. Seconds later, according to Fields, a police officer, followed by several others, sprinted into view, ordered Fields to the ground, beat and sprayed Mace at him, and then placed the incriminating red bandana over his neck.
The jury found Fields guilty of all the counts upon which he was indicted, and the trial court sentenced him to seven years' incarceration. Fields now raises six assignments of error. He alleges a trial error, a defective indictment, ineffective assistance of counsel, prejudicial closing remarks from the prosecutor, convictions unsupported by the evidence or against the weight of the evidence, and finally a sentencing error.
Fields first complains that it was the trial court's fault that he was tried while wearing inmate attire. He believes that this error was magnified when a witness identified Fields as "the male black with jailhouse blues," and the trial court failed to sua sponte issue some form of curative instruction.
While it is clear that the state could not have compelled Fields to appear at trial in prison attire,[5] Fields or his attorney bore the responsibility for making their style preference known to the court.[6]
There is nothing in the record indicating why Fields was dressed in jail garb; it is possible he preferred that form of dress. Though the better procedure would have been for the trial court to place something on the record as to the reason — to forestall a postconviction attack — without anything on the record to inform us, we cannot sustain the assignment. Once Fields appeared before the jury wearing a blue jumpsuit, we find no prejudice to Fields when one of the witnesses referred to him as being in "jailhouse blues." Surely, the origin of Fields's attire was no surprise to the jurors. Further, Fields's attorney did not object to the description, so there was nothing upon which the trial court could have ruled.And, finally, once Fields testified, the jurors became aware of his extensive criminal record,[7] so it would not have been difficult for them to envision him in jailhouse garb anyway. We thus overrule Fields's first assignment of error.
Fields next points out, as did his trial attorney, that the indictment identified Kamel Sawadeh as the victim subjected to physical harm during the robbery when, in fact, it was his son, Ali Kamel Sawadeh, whom Fields had threatened with the gun. The prosecutor offered at trial to amend the indictment if it perplexed Fields's attorney,[8] but the trial court felt that that was unnecessary. The trial court was correct. An indictment is legally sufficient if it gives "the accused notice of the offense of which he is charged."[9]
Fields was aware that he was charged in the indictment with, among other things, aggravated robbery. He now expresses no rationale concerning how the failure to distinguish between the owner of the store and his son prejudiced him. We thus overrule Fields's second assignment of error.
In his next assignment of error, Fields criticizes several aspects of his trial attorney's performance, which he contends was so deficient that he would not have been convicted had he been properly represented.[10]
Nonsense.
Fields first complains that his attorney failed to object to some leading questions that the state asked of its witnesses. This was not ineffective assistance of counsel, as the Ohio Supreme Court has recently expressly recognized.[11] Next he complains that his attorney failed to conduct a vigorous cross-examination of all of the state's witnesses. Fields does not suggest any particular matters that required further exploration, nor can we independently discern any substantive failure. Thus there was no prejudice to Fields.
Next Fields argues that his attorney should have asked the trial court to appoint an eyewitness expert to help him demonstrate the "inaccuracies resplendent in eyewitness identification." The eyewitnesses testified to the general size of the suspect, his limp and his attire. Also, the picture taken of the robbery in progress was introduced as evidence, so the jurors had an opportunity to see much of what the witnesses themselves had seen. Finally, because Fields wore a bandana, recognition of his facial features really was not an issue. Field was not prejudiced because his attorney did not ask for an eyewitness expert to be appointed.
Fields also mentions in passing that his attorney's failure to renew his motion for acquittal was another instance of his ineffectiveness. It is true that such a motion is almost routinely renewed, but since there was more than sufficient evidence to support a guilty verdict, such a failure in this case was harmless. Fields also wishes that his attorney would have polled the jury after the verdict was read. While that might have been appropriate, we can again discern no prejudice to Fields.
Finally, Fields complains that his attorney failed to object to certain comments made by the prosecutor during his closing argument to the jury. This issue is addressed more thoroughly below, but we again can discern nothing from the prosecutor's remarks that, even if improper, would have altered the outcome of Fields's trial. We thus overrule Fields's third assignment of error.
In his fourth assignment of error, Fields points to two specific examples of what he alleges to be prosecutorial misconduct in the state's closing argument. First, he notes the number of times that the assistant prosecutor used the term "I think" — our count is at least sixteen. Just from a public-speaking perspective, the assistant prosecutor needed to reduce his reliance on the phrase.
But, more importantly, it is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused.[12] The prosecutor crossed this threshold when he said, "I think the credibility of the State's witnesses, frankly, is unmatched by the credibility of the defense witnesses"; and again when he finished his closing argument with "this defendant is as guilty as I think everybody in this jury knows he is." We do not view these violations as egregious or intentional — but the assistant prosecutor needs to change his phraseology to avoid problems in the future.
While the prosecutor erred in his closing argument, it is also clear beyond a reasonable doubt that absent those remarks the jury would still have found Fields guilty.[13] The evidence was staggeringly overwhelming. Thus we overrule Fields's fourth assignment of error.
Fields argues in his fifth assignment of error that his conviction on all of the counts was against the manifest weight of the evidence, but he especially objects to his conviction on the gun specification.
According to Fields, the state's case against him was riddled with "substantial conflicts" that somehow the jury failed to recognize. This failure apparently resulted in the jury losing its way in assessing the weight of the evidence and creating a manifest miscarriage of justice by finding him guilty.[14] Fields cites only two examples of these substantial inconsistencies. One of the many witnesses mistakenly testified that Fields had a gray sweatshirt on when he saw him in the police squad car. In fact, he did not. The gray sweatshirt was behind the garage at that time. One mistake by one of many witnesses on a fairly innocuous point did not severely weaken the state's case.
Second, Fields argues that he had proved that his limp was so severe that he could not have leaned onto the counter to empty the cash drawer as the robber had done. The problem is that there was no evidence to suggest that the position the robber assumed was impossible for Fields.
Finally, Fields complains that he should not have been convicted of using a gun in the robbery because no gun was ever recovered, and the state failed to prove that what he trained on the victim was actually a weapon capable of being fired. The video tape belied this argument, and the victim clearly thought that he was being threatened with a gun that could be fired.
Though statutory language supports Fields's position somewhat, the Ohio Supreme Court has repeatedly held that evidence such as that presented in this case is sufficient to support a conviction. We thus overrule Fields's fifth assignment of error.[15]
Fields's sixth assignment of error focuses on his sentence. The trial court properly completed a sentencing worksheet that indicated the reasons for the sentence Fields received. But Fields complains that the court did not "verbalize," presumably to him, why it imposed consecutive sentences at the sentencing hearing.
The trial court did not have to "verbalize" its reasons. It was sufficient that the written record reflected that the trial court followed the mandated reasoning process and that the record supported the findings made in that process. In this case, the trial court appropriately documented the proper reasoning process and made findings supported by the record. Thus we affirm the sentence imposed by the trial court and overrule Fields's sixth assignment of error.
The judgment of the court of common pleas is affirmed.
Judgment affirmed.
Doan and Hildebrandt, JJ., concur.
Please Note:
The court has recorded its own entry on the date of the release of this Decision.
[1] See R.C. 2911.01(A)(1).
[2] See R.C. 2911.02(A)(2).
[3] See R.C. 2921.33(A).
[4] See R.C. 2921.12(A)(1).
[5] See Estelle v. Williams (1976), 425 U.S. 501, 96 S.Ct. 1691.
[6] See id. at 512-513; State v. Jones (Dec. 29, 1995), 1st Dist. No. C-950005; State v. Chaney (July 21, 1988), 8th Dist. No. 53814; State v.Broach (Dec. 26, 2001), 1st Dist. No. C-010233.
[7] See State v. Terrell (Dec. 30, 1981), 1st Dist. Nos. C-811048 and C-810164.
[8] See Crim.R. 7(D).
[9] See R.C. 2941.05; State v. Edwards (1986), 33 Ohio App.3d 233,236-237, 515 N.E.2d 643.
[10] See Strickland v. Washington (1984), 446 U.S. 668, 694,104 S.Ct. 2052.
[11] See State v. Jackson, 92 Ohio St.3d 436, 449, 2001-Ohio-1266,751 N.E.2d 946.
[12] See State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883, citing State v. Thayer (1931), 124 Ohio St. 1, 176 N.E. 656; DR 7-106(C)(4); DR 7-106(4).
[13] See State v. Davis, supra, at 15, citing United States v.Hastings (1983), 461 U.S. 499, 510-511, 103 S.Ct. 1974.
[14] See State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[15] See id.