DECISION
{¶ 1} Defendant-appellant, Robert Eugene Carsten, appeals from a judgment and sentence entered by the Franklin County Court of Common Pleas following a trial in which the jury returned a guilty verdict.
 {¶ 2} On February 8, 2001, appellant was indicted on one count of aggravated robbery, in violation of R.C. 2911.01, and two counts of robbery, in violation of R.C. 2911.02. All three counts resulted from a single incident occurring on December 31, 2000. Appellant entered a plea of not guilty on all counts.
 {¶ 3} On October 24, 2001, appellant's case came to trial before a jury. The prosecution's first witness was Mrs. Helen Lowe, the victim of the offense. Mrs. Lowe testified that at 9:30 p.m. on the night of December 31, 2000, she returned home after attending church, as she does every Sunday night. As she tried to open the front gate to her home, a white man, standing approximately six feet tall and wearing a hooded gray shirt with a bandanna across his face as a mask, approached and demanded her purse. Mrs. Lowe refused to comply. When the man repeated the demand a third time, Mrs. Lowe saw that he held a knife, the blade approximately six inches in length, in his hand. Mrs. Lowe heard her husband yell out the window from the upper floor of their home, and then the robber grabbed her purse, simultaneously injuring her shoulder by pushing her down and into the fence. Mrs. Lowe saw the robber run to the left and around the corner, between her home and the neighboring house ("385½ S. Central"). As the fleeing man turned the corner, Mrs. Lowe's granddaughter, Patricia Owens, and son-in-law gave chase, leading Mrs. Lowe to believe that "[t]here is no way that anybody could have went anywhere" other than that house. (Tr. 172). Mrs. Lowe later learned that appellant lived at 385½ S. Central.
 {¶ 4} Mrs. Lowe further testified that she was carrying $300 in her purse when it was taken from her. The money, broken down into six 50-dollar bills, was "bill money," money specifically budgeted to pay bills and marked with her initials by either she or her husband. Mrs. Lowe explained that, for at least the past two years, they had so marked the "bill money" so that she would remember not to spend it elsewhere. She also identified a photograph introduced as State's Exhibit A-8 as one showing a marked 50-dollar bill like those taken with her purse.
 {¶ 5} Patricia Owens ("Owens"), the victim's granddaughter, next took the stand. Owens testified that she, her husband and their baby lived with her grandparents. On the night of the robbery, she was inside watching television when she heard her grandpa yelling upstairs and a "thunk"-noise from outside. She then looked out the window, saw that something was wrong and ran outside followed by her husband.[1] Owens' grandma said she had been robbed and told them the direction in which the robber had fled.
 {¶ 6} Owens then explained that several inches of fresh snow was on the ground. So, running in the direction indicated by her grandma, she noticed some footprints in the snow and followed them around the far side of the green house where there is a fire escape and a basement door. When she reached that point, the footprints ended. Looking up and around the stairs at the fire escape and basement door, she saw no one and continued around to the backyard. There, she met her husband who had run directly between the Lowe's house and 385½ S. Central and through to the backyard. "And whoever it was, was gone. Because there's no way they could have went nowhere else but around that house. And they was gone." (Tr. 218). Neither pursuer saw anyone fleeing as they searched the area, nor did they directly see anyone enter or exit the building.
 {¶ 7} Owens' testimony provided several other details. Owens was present while her grandma described the man's appearance, black and gray shirt, jeans, bandanna covering the bottom of his face but showing his eyes and forehead, to the police. And, when appellant answered the door at the police's knock, Owens stated that she noticed he was wearing clothing matching that description, less the bandanna. She was also familiar with her grandparents' habit of marking their "bill money" with Mrs. Lowe's initials.
 {¶ 8} The prosecution then called Mr. Robert Price. He testified that he had been the owner of 385½ S. Central. At the request of a friend, he had allowed appellant to move into the upper floor of the house that November; Mr. Price set the rent at $60 a week. In the weeks preceding the robbery, appellant had fallen behind in rent. However, because Mr. Price was no longer interested in owning the property, he told appellant to just vacate the house and forget about the overdue payments.
 {¶ 9} Regardless, Mr. Price received a phone call from appellant sometime around midnight on December 31, 2000. Appellant told him he had some rent money. Mr. Price answered that it was late and he would come collect the money the next day. He also recalled that appellant had stated, "You don't know what I had to go through to get this money." (Tr. 274). Mr. Price did not recall receiving any other phone calls from appellant that day.
 {¶ 10} The next day, Mr. Price and his daughter went to collect appellant's rent. Mr. Price stated that appellant gave him one week's rent, or $60, a 50-dollar bill and a ten.
 {¶ 11} Soon afterward, in the beginning of January, Mr. Price had Mr. Lowe do some repair work on his car. Mr. Price stated that he used the rent money he received from appellant to cover most of the payment. When he received the money, Mr. Lowe asked Mr. Price, "Where did you get this money?" (Tr. 279). Mr. Price told him he had collected it as rent.
 {¶ 12} Appellant's housemate, Mr. Samuel Sexton ("Sexton"), also took the stand as a witness for the state. Sexton stated that he is approximately five feet seven inches tall. At the time of the robbery, he lived at 385½ S. Central, sharing a bathroom and kitchen facilities with appellant and Lisa Moore, but with his own bedroom. On the night of December 31, 2000, Sexton testified that he was in his room reading when he heard a commotion:
 {¶ 13} "* * * It was about maybe 10:30, 10:40, I hear a ruckus outside. I hear a voice, `Give me your purse. Hey, give me your purse.' I hear some running, I guess. I'm in my room. It's running behind me down the — I don't know, it was yard, bushes between the house. I'm in the house. Next door running towards the back, down the side.
 {¶ 14} "I hear the bottom door open, slam shut. I hear Bob call out Lisa's name: `Come here.' I hear like a bag rustling. I hear him say, `Take this. Get rid of this. Take this. Go through that.' " (Tr. 333).
 {¶ 15} Sexton further testified that he recognized the voice he heard from outside, as well as the voice heard inside, as that of appellant. However, Sexton did not know until the following morning that the victim was the older woman next door, Mrs. Lowe.
 {¶ 16} Sexton heard appellant talking to the police when they arrived. After the police had left, Sexton came out of his room and asked appellant what was going on. Appellant answered that "he had to do what he had to do," and "I got Bob's money," referring to Mr. Price. (Tr. 347-348). Sexton asked appellant if anyone would be able to identify him; appellant replied that no one would be able to identify him because he was covered up. Later that night, Sexton also heard appellant call Mr. Price regarding the rent.
 {¶ 17} He further recalled talking about appellant's money problems prior to the robbery. Appellant had commented before that "he would have to do what he had to do" in order to pay the rent. (Tr. 352). He had to keep a roof over his head, and his girlfriend's head, but he couldn't get a job.
 {¶ 18} Mr. William Lowe, the victim's husband, testified that he was lying in bed watching television when he heard his wife struggling outside. When he yelled down from the window, the robber jerked his wife's purse and ran away. Further, when Mr. Price paid him $80 for the car repair work, he was given a 50, a 20, and a ten-dollar bill. As he counted the money before putting it his pocket, he noticed his wife's initials marked on the 50-dollar bill. And, when asked, Mr. Price told him he had gotten the bill as rent.
 {¶ 19} The defense opened with Ms. Lisa Moore, appellant's girlfriend. Moore testified that she and appellant lived together at 385½ S. Central and otherwise shared incomes and expenses. Both worked sporadically through several different sources and had earned approximately $1,600 between November 2000 and January 2001. That money went towards paying for rent, food, Christmas presents for her children, and other miscellaneous expenses. Although they had fallen behind in their rent payments before, during cross-examination Moore explained that their financial situation was not one in which either would need to steal.
 {¶ 20} Moore further explained that she and appellant had filed a complaint regarding various building code violations, which had upset Mr. Price. She first said the complaint was filed in December, but later indicated a date in January.
 {¶ 21} On the night of the robbery, Moore stated that she and appellant were both watching a Faith Hill concert on television. Neither left their room until around "9:30, 9:33, 9:35 or so" when they heard the Columbus police banging on the front door to investigate the robbery. (Tr. 437). She stated that Officer Forsythe and two male officers entered the house. The police briefly questioned her and appellant. Appellant then walked around the building with the officers, showing them all the available exits and entrances. After about 20 minutes, the police left without incident. Moore denied either she or appellant had any involvement in the robbery.
 {¶ 22} Moore also said that appellant placed several calls to Mr. Price on December 31, 2000. Moore testified that the first two calls, placed at 2:10 and 3:30 in the afternoon, were about the rent money. During the first, appellant told Mr. Price that they had rent money available; and, in the second, Mr. Price told them he would be out the next day. Moore said that the evening call, placed around 10:30 p.m., was to inform Mr. Price about the robbery. Moore stated that Mr. Price was paid a week's rent the next day, but with three 20-dollar bills, not a 50 and a ten.
 {¶ 23} Moore confirmed that Sexton was at home during the evening of December 31, 2000. However, she denied that appellant confessed to any involvement in the robbery. Rather, they did not see Sexton until around 11:30 p.m., when he asked them if they wanted to watch the ball drop for New Year's.
 {¶ 24} The defense presented a total of seven additional witnesses. Gerald Bohanan, the paramedic who attended to Mrs. Lowe after the robbery, testified that he arrived at the scene at 9:34 p.m. Mrs. Lowe was very distraught and emotionally upset, but did not want to be taken to the hospital. Following a brief evaluation, Mrs. Lowe did not appear to have any physical injuries.
 {¶ 25} Officer Forsythe and Detective Morrow of the Columbus Police Department also took the stand. Officer Forsythe stated that she responded to a robbery call at 9:33 p.m., and spoke to the victim who indicated the direction of the robber's flight. She also related that her hand was hurting. Officer Forsythe did not recall ever entering 385½ S. Central, but did recall speaking to the inhabitants. Detective Morrow testified that he also responded to the robbery. He recalled investigating the footprints located around 385½ S. Central and being present in the house while other officers searched the front room.
 {¶ 26} Michael O'Keefe, a property inspector for the city of Columbus, testified that he sent a code violation notice to the record owner of 385½ S. Central on January 17, 2001. O'Keefe explained that the complaint could not have been filed prior to January 13, 2001, as housing inspectors are required to answer complaints within a maximum of five days. O'Keefe did not recall any other complaints filed for that property.
 {¶ 27} Mr. Donald Brown testified that he was the record owner of 385½ S. Central at the time of the robbery, as his name was still on the deed. Mr. Price was purchasing the property through a lease with an option and would not receive the deed until all payments were made. Mr. Brown received notice of housing violations sometime in January 2001.
 {¶ 28} Mr. Dennis Nielson, a former employer of appellant and Lisa Moore, also testified for the defense. He confirmed that he had paid the couple, in combined total, just under $800 in December 2000. Finally, Mr. Todd Caudill, an investigator for the defense, testified that he had interviewed several of the witnesses in the case and provided the public defender with the information.
 {¶ 29} The trial concluded on November 1, 2001, with each party making closing arguments. The jury was then charged and retired to deliberations. Some time later, the trial court instructed the jury pursuant to State v. Howard (1989), 42 Ohio St.3d 18, when informed of the jury's deadlock as to the first count of the indictment. Shortly after that instruction, the jury returned, finding appellant guilty on all counts.
 {¶ 30} On November 6, 2001, the trial court sentenced appellant to nine years in the state penitentiary. Pursuant to defense counsel's motion, the trial court set aside a previously filed entry and reentered judgment on January 29, 2002, thus reinstating the time in which appellant could timely file his notice of appeal. Appellant appeals and sets forth the following assignment of error:
 {¶ 31} "Mr. Carsten was deprived of his right to a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution when counsel failed to object to the state's false assertions during closing arguments and improper character assassination of Mr. Carsten's chief witness."
 {¶ 32} Though set forth in a single broad assignment of error, appellant essentially challenges two different issues. First, appellant claims that certain instances of prosecutorial misconduct deprived him of a fair trial. Second, appellant asserts that defense counsel's failure to object to the alleged prosecutorial misconduct amounts to a deprivation of his constitutional right to the effective assistance of counsel. For the reasons that follow, we affirm the trial court's judgment.
 {¶ 33} We begin with appellant's contention that he was denied a fair trial due to prosecutorial misconduct. More specifically, appellant claims that the prosecutor improperly and wrongfully misrepresented the facts during her closing argument, and engaged in improper questioning of Lisa Moore, appellant's primary witness. We address these contentions in the order presented.
 {¶ 34} A prosecutor's conduct during trial will not amount to reversible error unless that conduct negates the defendant's right to a fair trial. State v. Loza (1994), 71 Ohio St.3d 61, 78; State v. Maurer (1984), 15 Ohio St.3d 239, 266. Therefore, when reviewing instances of alleged misconduct, an appellate court must first discern whether the prosecutor's conduct was improper and, if so, examine whether that conduct prejudicially affected the substantial rights of the accused. State v. Lott (1990), 51 Ohio St.3d 160, 165; State v. Smith (1984),14 Ohio St.3d 13, 14. The core of that analysis must be "the fairness of the trial, not the culpability of the prosecutor." State v. Landrum (1990), 53 Ohio St.3d 107, 112, citing Smith v. Phillips (1982),455 U.S. 209, 219, 102 S.Ct. 940, 947. Accordingly, the effect of any alleged misconduct "must be considered in the light of the whole case." Maurer, supra, at 266. Ultimately, error exists only where it is clear beyond a reasonable doubt that the jury would have returned an opposite verdict, i.e., not guilty, absent the prosecutor's comments. State v. Smith, supra, at 15, citing United States v. Hasting (1983), 461 U.S. 499,510-511, 103 S.Ct. 1974, 1981.
 {¶ 35} Appellant first claims that the prosecutor improperly misrepresented the facts during closing arguments. More specifically, the prosecutor stated, "Mr. Sexton says that Carsten fanned out the bills and they were fifties." Appellant asserts that placing the money in his possession in such a manner effectively placed new and incriminating evidence before the jury and constitutes misconduct.
 {¶ 36} Initially we note that, generally, wide latitude is granted to both parties in closing arguments. State v. Parrish (1991),71 Ohio App.3d 659, 667; Maurer, supra, at 269. Yet, "[i]t is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury." State v. Smith, supra, at 14. As appellant contends, a review of the transcript reveals that, Sexton never stated that appellant showed him, let alone fanned out, the stolen money. Indeed, in retrospect, the prosecutor acknowledges that the statement was improper.
 {¶ 37} However, the record also reveals that defense counsel never objected to the prosecutor's statement. And, since a claim of error in a criminal case cannot be based on remarks that were not objected to, appellant has waived all but plain error. Loza, supra, at 75. Plain error, an error or defect affecting substantial rights, does not exist unless it can be said that, but for the error, the outcome of the trial clearly would have been otherwise. State v. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus; Crim. R. 52(B). Furthermore, "[n]otice of plain error under Crim.R. 52(B) is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus. See, also, State v. Barnes (2002), 94 Ohio St.3d 21, 27; State v. Johnson (1989),46 Ohio St.3d 96, 102.
 {¶ 38} After reviewing the evidence properly before the jury, we decline to accept appellant's assertion that the prosecutor's improper remark during closing arguments amounts to plain error. If believed by the jury, the testimony Sexton did provide was equally incriminating, if not more so. For example, Sexton stated that he recognized appellant's voice as the robber outside, and he recounted appellant's apparent admission. And, the testimony of other witnesses provided a plausible link from the victim's stolen, marked bills to appellant's rent money. Furthermore, the jury was instructed on several occasions that closing arguments are not evidence; and, juries are presumed to follow those given instructions when delivering a verdict. Pang v. Minch (1990),53 Ohio St.3d 186, 195. Viewing the trial in its entirety, it cannot be said that the prosecutor's remark during closing arguments was outcome determinative.
 {¶ 39} Appellant also contends that the prosecutor committed further misconduct by wrongfully attacking appellant's key witness, Lisa Moore, with regard to her character as a mother. Specifically, during cross-examination, the prosecutor inquired as to when and why Moore had lost custody of her children. Defense counsel objected to the latter inquiry, but not the former. The prosecutor again briefly mentioned Moore's loss of custody, as well as her blemished employment history, during closing arguments. Again, no objection was raised. Appellant argues that such conduct improperly poisoned the jury against Moore and appealed to the jury's passion, rather than deliberative reason.
 {¶ 40} The state maintains that the prosecutor's comments were not improper, but were well grounded, and that appellant has failed to demonstrate the existence of plain error. On direct examination, Moore testified that she and appellant lived together and had earned enough money to pay for rent, bills, and Christmas presents for her children. And, during both direct and cross-examination, Moore stated that they had no financial need to turn to theft. The state argues that the prosecutor's comments were designed to rebut Moore's testimony, by revealing their financial difficulties, and to show her natural bias towards appellant's plight.
 {¶ 41} Regardless of the questionable motivation behind the prosecutor's questions and statements regarding Moore's character, when viewed in the context of the trial as a whole, we do not believe appellant has shown sufficient prejudice to establish prosecutorial misconduct. In light of other compelling evidence presented at trial, we find that the prosecutor's statements did not ultimately influence appellant's conviction. In other words, it is not clear beyond a reasonable doubt that the jury would have found appellant not guilty absent the challenged conduct. Smith, supra.
 {¶ 42} Furthermore, with the exception of the second question concerning Moore's children, defense counsel raised no objection to the prosecutor's arguments. And, as above, the jury is presumed to follow the trial court's instruction to disregard any question to which an objection is sustained. Pang, supra. Again, plain error analysis applies. Because appellant failed to establish that the prosecutor's conduct was outcome determinative in nature, or that a manifest miscarriage of justice has taken place, we find no plain error. Long, supra.
 {¶ 43} Accordingly, appellant's contention that he was denied a fair trial due to prosecutorial misconduct is not well-taken.
 {¶ 44} Appellant further asserts that defense counsel's failure to object to the aforementioned misconduct amounted to a deprivation of his right to the effective assistance of counsel, thus denying him a fair trial.
 {¶ 45} To warrant reversal due to ineffective assistance of counsel, appellant must show that: (1) his counsel's performance was deficient to the extent that he was not actually providing "counsel"; and (2) the offending performance prejudiced appellant's defense so as to deprive him of a fair trial. Strickland v. Washington (1984), 466 U.S. 668,686, 104 S.Ct. 2052, 2064; Lott, supra, at 174. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, at 686. Moreover, Ohio courts presume that a properly licensed attorney is competent and will act accordingly; therefore, appellant bears the burden of proving ineffectiveness. Lott, supra, at 174-175, citing State v. Smith (1985), 17 Ohio St.3d 98, 100.
 {¶ 46} Appellant offers no more than his counsel's failure to object to alleged misconduct to support his claim that he was denied effective assistance of counsel. No further argument is offered to establish deficient performance, nor does appellant offer additional insight as to how the outcome of the trial was undermined or prejudicial. Thus, in light of our previous findings that the prosecutor's conduct did not prejudicially affect the outcome of the trial, we similarly conclude that defense counsel's failure to object to that conduct did not prejudice appellant. Without a showing of prejudice, appellant cannot support a claim of ineffective assistance of counsel. Strickland. Therefore, we need not inquire as to any deficiency in counsel's performance. See State v. Cosolis, Franklin App. No. 01AP-1070, 2002-Ohio-4302, at ¶ 78. Appellant's challenge regarding ineffective assistance of counsel is unpersuasive.
 {¶ 47} Based on the foregoing, we find that appellant was accorded a fair trial. Accordingly, we overrule appellant's single assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
PETREE and BROWN, JJ., concur.
[1] Mr. Owens was not at the trial due to a family emergency in Kentucky.