OPINION *Page 2 
{¶ 1} Defendant-appellant Deborah Walker appeals her conviction in the Richland County Court of Common Pleas on one count of domestic violence and one count of disrupting public service. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACT AND CASE {¶ 2} On October 31, 2006, Appellant was staying at her mother's home on East Fourth Street in Mansfield, Ohio. Appellant's mother, Pauline Elston, was sixty-nine years old, and suffered from diabetes. Appellant has a history of violence against her mother, including a conviction for domestic violence in the Mansfield Municipal Court, Case Number 97-CRB-2331.
 {¶ 3} On the above date, Appellant started to argue with her mother because Elston would not give her any money. When Elston told Appellant she did not have any money, Appellant responded she had a credit card, a car, and "everything." Appellant then told her mother to go to her room. Elston ignored Appellant, indicating she was going to go to the drugstore to fill some prescriptions. At that point, Appellant came toward Elston with her arms out like she was going to hug her. Instead, she put her hands around Elston's throat and began to choke her. Elston screamed at Appellant, and tried to get her to stop. Appellant finally released her, when Elston was able to turn her head and bite Appellant's thumb.
 {¶ 4} Appellant then walked into the living room, remaining there for approximately fifteen minutes. An old-fashioned cradle phone hung on the living room wall. Appellant pulled the telephone wires out of the wall. *Page 3 
 {¶ 5} Appellant then returned to the dining room with a plastic coat hanger, and began beating Elston with the hanger. After the hanger broke, Appellant began slapping Elston in the face, threatening to beat her with a hairbrush. At some point, Appellant pushed Elston into the dining room table, on to one of the chairs.
 {¶ 6} After Appellant stopped the beating, Elston was able to leave the house, again indicating she was going to the drugstore to have prescriptions filled. Appellant told Elston to bring her back a newspaper and something to drink.
 {¶ 7} Linda Shaffer, a pharmacy technician at Hursh Drug, testified when Elston came into the store her face was swollen and she had a contusion on her chin. She further stated Elston's demeanor was scared and sad, compared to her usual friendly demeanor. When Shaffer inquired, Elston told her she had argued with her daughter, but refused Shaffer's offer to call the police.
 {¶ 8} After leaving the pharmacy, Elston went to her sister's house, where she called the police. Elston's sister, Patty Hamilton, testified when Elston arrived at her house, she could tell something was wrong. There was a mark on her face, the side of her face was swollen and she had choke marks on her neck. Elston complained her shoulder was sore, and she was scared and upset.
 {¶ 9} As a result of the incident on October 31, 2006, Appellant was indicted on one count of domestic violence and one count of disrupting public service. A jury trial commenced on May 14, 2007. The State presented the testimony of Elston, Patty Hamilton, Linda Shaffer and Mansfield Police Officer Donald Rhinehart. At the conclusion of the first day of trial, the State rested its case. The defense was scheduled to present the following morning. However, Appellant failed to appear for trial the next *Page 4 
day. Her attorney indicated on the record he did not know of her whereabouts. The trial court then informed the jury Appellant waived her right to be present. The defense rested its case, and the trial court proceeded to closing arguments. Following deliberation, the jury found Appellant guilty as charged and the trial court issued a warrant for Appellant's arrest.
 {¶ 10} On May 25, 2007, the trial court sentenced Appellant to eighteen months incarceration on each count, with said sentences to run concurrently. The court further imposed two years of post-release control.
 {¶ 11} Appellant now appeals, assigning as error:
 {¶ 12} "I. THE SUBSTANTIAL RIGHTS OF THE DEFENDANT WERE PREJUDICED BY THE IMPROPER REMARKS MADE BY THE STATE OF OHIO, BY AND THROUGH THE RICHLAND COUNTY PROSECUTOR'S OFFICE, DURING CLOSING ARGUMENTS.
 {¶ 13} "II. THE MANIFEST WEIGHT OF THE EVIDENCE WAS NOT SUFFICIENT TO SUPPORT A VERDICT OF GUILTY."
 {¶ 14} In the first assignment of error, Appellant argues the prosecutor's closing arguments violated her Constitutional right not to appear for trial. Specifically, Appellant cites the following statements of the Prosecutor during closing arguments:
 {¶ 15} "Mr. Tunnell: It is news to me that Mr. Hitchman and I agree so often. Mr. Hitchman doesn't know why his client's not here today, but doesn't think that it should be a factor in your decision. Sure, it should.
 {¶ 16} "Mr. Hitchman: I object.
 {¶ 17} "Mr. Tunnell: He went there. *Page 5 
 {¶ 18} "The Court: Any further comment will not be acceptable.
 {¶ 19} "Mr. Tunnell: Very well, Judge."
 {¶ 20} Tr. at 232-233.
 {¶ 21} Prior to the prosecutor's remarks, the trial court stated on the record:
 {¶ 22} "The Court: The State had rested at the end of the day yesterday — at the end of the State's witnesses yesterday. The issue at this point is whether or not the Defendant's going to put on a defense. You can obviously see the Defendant is not here, and we don't know why she is not here. She has a constitutional right to be here and to testify if she elects to do so. But as with all constitutional rights, she has the right to waive that if she elects, and intentionally elected not to be here this morning. We're going to proceed. If she does, in fact, show up and we find that there was some misadventure that caused her to be late, we'll deal with that as the — as it comes up."
 {¶ 23} Tr. at 214-215.
 {¶ 24} Further, prior to the prosecutorial remarks Appellant's counsel stated:
 {¶ 25} "Mr. Hitchman: If it please the Court and Mr. Tunnell, ladies and gentlemen of the jury, I do not have a client this morning. I don't know why she didn't show up. But we're proceeding on because the evidence has been submitted to you. And, frankly, if I were sitting in your shoes, that would be a factor. That would be some sort of an impact in my mind. I'm going to suggest to you that that's not a factor and you're going to have to overcome that in looking at just the facts of the case that have been presented, the law that's given to you by Judge Henson."
 {¶ 26} Tr. at 227. *Page 6 
 {¶ 27} The Supreme Court of Ohio has limited the instances when a judgment may be reversed on grounds of prosecutorial misconduct. SeeState v. Lott (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293, 300. The analysis of cases alleging prosecutorial misconduct focuses on the fairness of the trial and not the culpability of the prosecutor. Id. A reviewing court is to consider the trial record as a whole and is to ignore harmless errors "including most constitutional violations." Id., quoting United States v. Hasting (1983), 461 U.S. 499, 508-509,103 S.Ct. 1974, 1980-1981, 76 L.Ed.2d 96. Accordingly, a judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial. State v. Carter,72 Ohio St.3d 545, 557, 1995-Ohio-104, 651 N.E.2d 965, 976-977.
 {¶ 28} A prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones. Berger v.United States (1935), 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314. "In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a reviewing court must determine if the remarks were improper, and, if so, whether they actually prejudiced the substantial rights of the defendant." State v. Overholt, Medina App. No. 02CA0108-M, 2003-Ohio-3500, at paragraph 47, citing State v. Smith
(1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883, 885 "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." State v. Hill (1996), 75 Ohio St.3d 195, 204,661 N.E.2d 1068, 1078, citing Donnelly v. DeChristoforo (1974),416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431. Furthermore, the appellant must show that there is a reasonable probability that but for the prosecutor's misconduct, the result of the proceeding would *Page 7 
have been different. State v. Loza (1994), 71 Ohio St.3d 61, 78,641 N.E.2d 1082, 1101, overruled on other grounds.
 {¶ 29} While we agree the prosecutor's remark made during closing argument was improper, in light of the statements made by the trial court and defense counsel, Appellant has not demonstrated the results of the trial would have been different but for the prosecutorial statements. Accordingly, Appellant has failed to demonstrate prejudice resulting from the prosecutor's statements.
 {¶ 30} The first assignment of error is overruled.
 II. {¶ 31} In the second assignment of error, Appellant argues her conviction for disruption of public service is against the manifest weight of the evidence.
 {¶ 32} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N .E.2d 541 super ceded by constitutional amendment on other grounds as stated by State v. Smith,80 Ohio St.3d 89, 1997-Ohio-355, 684 N .E.2d 668, citing State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence *Page 8 
and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 33} Appellant was convicted of disrupting public service, in violation of R.C. 2909.04(A):
 {¶ 34} "(A) No person, purposely by any means or knowingly by damaging or tampering with any property, shall do any of the following:
 {¶ 35} "(1) Interrupt or impair television, radio, telephone, telegraph, or other mass communications service; police, fire, or other public service communications; radar, loran, radio, or other electronic aids to air or marine navigation or communications; or amateur or citizens band radio communications being used for public service or emergency communications;
 {¶ 36} "(2) Interrupt or impair public transportation, including without limitation school bus transportation, or water supply, gas, power, or other utility service to the public;
 {¶ 37} "(3) Substantially impair the ability of law enforcement officers, firefighters, rescue personnel, emergency medical services personnel, or emergency facility personnel to respond to an emergency or to protect and preserve any person or property from serious physical harm."
 {¶ 38} Appellant maintains the evidence adduced at trial indicates there was more than one phone in the residence, and there is no evidence Appellant was attempting to keep her mother from calling someone. Appellant asserts she broke the phone in a fit of rage; therefore, did not have the culpable mental state to be guilty of the crime. *Page 9 
 {¶ 39} At trial, Pauline Elston testified Appellant pulled the wires of the telephone out of the wall after choking her and beating her:
 {¶ 40} "Q. Do you have a telephone at your house?
 {¶ 41} "A. Yes.
 {¶ 42} "Q. Did you that day?
 {¶ 43} "A. Yes, but she pulled the wires out of the wall.
 {¶ 44} "Q. Okay. When did that happen?
 {¶ 45} "A. I can't tell you exactly when, but it was — it was sometime during this argument, so forth.
 {¶ 46} "Q. Where is the phone located at your house?
 {¶ 47} "A. The phone that she tore out of the wall is located in my living room.
 {¶ 48} "Q. Is that the room where she was sitting?
 {¶ 49} "A. Yeah, that's where she was sitting. That's where my TV is.
 {¶ 50} "Q. And you were over in the dining room?
 {¶ 51} "A. I was in the dining room. I've got a big archway there.
 {¶ 52} "Q. Do you know why she tore the phone out of the wall?
 {¶ 53} "A. She obviously didn't want me to use it.
 {¶ 54} "Q. So the phone wasn't an option?
 {¶ 55} "A. Oh, to call somebody —
 {¶ 56} "Q. Yes, ma'am.
 {¶ 57} "A. — from my home?
 {¶ 58} "Q. Yes, ma'am.
 {¶ 59} "A. Good Lord, no. I couldn't have called the police from my house. *Page 10 
 {¶ 60} "Q. Why not?
 {¶ 61} "A. Why, she would have hurt me then worse than what she did.
 {¶ 62} "* * *"
 {¶ 63} Tr. at 147-148.
 {¶ 64} On redirect, Elston testified:
 {¶ 65} "Q. Miss Elston, this phone that was in your living room, what kind of phone was it?
 {¶ 66} "A. It's a cradle phone. It's an old-fashioned cradle phone.
 {¶ 67} "Q. Okay.
 {¶ 68} "A. Black.
 {¶ 69} "Q. With the buttons you push?
 {¶ 70} "A. Yeah, it's got buttons on it.
 {¶ 71} "Q. It's all one unit there? Have you got a second phone?
 {¶ 72} "A. I do now. I didn't — oh, yes, I had a cradle phone, but they weren't working. And before she got — before the phone got fixed, Debbie got this cradle phone to work.
 {¶ 73} "Q. What do you mean by `cradle phone'? The second phone?
 {¶ 74} "A. It's one that you just sit in the — one of those electric things.
 {¶ 75} "Q. Okay. If [sic] doesn't have any wires or anything?
 {¶ 76} "A. It's got wires.
 {¶ 77} "Q. You can walk around with it?
 {¶ 78} "A. Yeah. It plugs into the wall.
 {¶ 79} "Q. But it's a separate phone from the one she pulled out? *Page 11 
 {¶ 80} "A. Oh, yeah. It wasn't working for a long time.
 {¶ 81} "Q. But she could get it to work?
 {¶ 82} "A. Yeah, she got it to work. She's very handy like that."
 {¶ 83} Tr. at 165-166.
 {¶ 84} Based upon all the circumstances, we find there was competent, credible evidence for the trier of fact to infer Appellant ripped the telephone wires from the wall to prevent her mother from calling for help. Accordingly, the second assignment of error is overruled.
 {¶ 85} Appellant's conviction in the Richland County Court of Common Pleas is affirmed.
 Hoffman, P.J., Gwin, J. and Wise, J. concur. *Page 12 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Richland County Court of Common Pleas is affirmed. Costs assessed to Appellant. *Page 1